STATE OF MISSOURI, ex rel. John ASHCROFT, Missouri Clean Water Commission, Department of Natural Resources, the Missouri Conservation Commission, Dale Rountree, Max A. Smith, Calvin C. Johnson, Alton Burns, James E. Jones, Kenneth D. McCall, Ray Pinkman, Shelby A. Masters, Scott Johnson, and David Johnson, Plaintiffs,

v.

DEPARTMENT OF the ARMY, CORPS OF ENGINEERS, Clifford Alexander, Jr., Lt. Gen. John W. Morris, Col. Richard Curl, Defendants.

Committee on Power for the Southwest, Inc., Intervenor.

Civ. A. No. 78–3092–CV–S.

United States District Court, W. D. Missouri, S. D.

Dec. 24, 1980.

Robert M. Lindholm, Asst. Atty. Gen., State of Mo., Jefferson City, Mo., for plaintiff State of Mo.

Cyril M. Hendricks, Gen. Counsel, Mo. Conservation Com'n., Jefferson City, Mo., for plaintiff Mo. Conservation Com'n.

Joseph B. Phillips, Stockton, Mo., for plaintiffs landowners.

Ronald S. Reed, U. S. Atty., August V. Spallo, Asst. Dist. Counsel, Corps of Engineers, Kansas City Dist., Kansas City, Mo., for defendants.

Jay M. Galt, Oklahoma City, Okl., for intervenor.

## MEMORANDUM OPINION AND ORDER

COLLINSON, Senior District Judge.

This action involves a challenge to the Army Corps of Engineers' operation of a hydroelectric generator in a dam of the Sac River near Stockton, Missouri. Plaintiffs include the State of Missouri, the Missouri Clean Water Commission, the Department of Natural Resources, the Missouri Conservation Commission, and a class of riparian landowners. Defendants are the U.S. Army Corps of Engineers (the "Corps") the Secretary of the Army, the Chief of the Corps, and the District Engineer for the Kansas City, Missouri, District of the Corps.

Plaintiffs' complaint is in four counts. Count I alleges violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (1976). In Count II, plaintiffs allege that defendants failed to comply with the applicable provisions of the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.* (1976). In Count III, plaintiffs aver that defendants' operation of the hydroelectric power plant at Stockton Dam has been, or will be, in violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1323 (1976), and the Missouri Clean Water Law, §§ 204.051.1 and 204.076, RSMo. (Supp.1975). In Count IV of their complaint, plaintiffs allege that defendants' operation of the project is inconsistent with the statute authorizing the construction of the dam. Finally, plaintiffs assert that defendants' proposed operation of the project constitutes a continuing nuisance.

This action was fully tried to the Court on April 14–23, 1980. Both parties subsequently filed post-trial briefs setting forth their respective positions, and the matter is now ready for decision.

Because resolution of the statutory issues presented by Count IV of plaintiffs' complaint may render moot most or all of the remaining questions in this action, the Court will first consider whether plaintiffs are entitled to prevail on Count IV of their complaint.

I.

A. *Factual Background*

The Sac River is a meandering stream flowing north from the Springfield, Missouri, area and emptying into the Osage River, a tributary of the Missouri River, in central Missouri. Like many such meandering rivers, the Sac River in its natural state provided both benefits and burdens to the people who lived nearby. The river supplied a habitat suitable to many different species of fish, and was used for such recreational activities as fishing, hunting, trapping, canoeing, and swimming. The farmers living nearby used the river to water their animals. The water was virtually unpolluted, clear and clean.

But the Sac River as it existed in its natural state from time to time posed grave dangers to man. Heavy rains resulted in bluff-to-bluff floods, inundating farmland located along the banks of the river. As the Board of Engineers for Rivers and Harbors noted in a 1949 report, "[t]he Osage River Basin is subject to damaging floods which may occur at any time of the year as a result of intense rainfall ...," and causing annual damage of over $5,000,000. House Document No. 549 (hereinafter "H.D.No. 49"), at p. 13.

Recognizing the economic and human losses caused by the periodic flooding of the Osage River Basin, in 1943 a committee of the Congress asked the Board of Engineers for Rivers and Harbors to prepare a report on the advisability of a flood control plan for that area. The Corps of Engineers for the Kansas City District accordingly conducted a study of the matter and, on January 14, 1948, submitted its report on the proposed project. The District Engineer recommended the construction of several projects in the Osage River Basin, including a dam and reservoir on the Sac River near Stockton, Missouri. He stated that operation of the proposed projects

> ... would be favorable for power development and studies show that installation of hydro-electric power facilities should be included as a part of initial development at the Pomme de Terre and Stock-

ton Projects. Studies made in connection with this report indicate that an installed capacity of about 7,000 kilowatts at each of the projects could be justified under probable market conditions.

\* \* \* \* \* \*

> The method of operation of the proposed reservoirs and the recommended power installations is based on studies of current conditions for the purpose of determining the results that might be accomplished by construction of the reservoir system and with a view toward establishment of the economic justification.... It is considered that modifications and changes in the plan of operation or size of power installation, which may later appear desirable could be made.

H.D.No.549, at pp. 27 and 30. The District Engineer accordingly recommended approval of the projects, "with such modifications and such other supplemental flood control works ... as the Secretary of the Army and the Chief of Engineers may find advisable...." H.D.No.549, at p. 31.

After a review of the study prepared by the District Engineer, the Board of Engineers sent its own report to the Chief of Engineers on April 22, 1949. In that report, the Board noted that:

> Power installations of 7,000 kilowatts are provided for in the plans for Stockton and Pomme de Terre Projects and power plants could be installed at the remaining reservoir projects if found justifiable in the future.

H.D.549, at p. 14. The Board specifically concurred in the views and recommendations of the District Engineer and recommended that the proposed flood control projects for the Osage River Basin be approved "generally in accordance with the plans of the District Engineer and with such modifications and such other supplemental control works in the Osage River Basin as in the discretion of the Chief of Engineers may be advisable...." H.D.No. 549, at pp. 15–16. The Chief of Engineers concurred in the views and recommendations of the Board of Engineers. H.D.No. 549, at p. 11.

The Corps of Engineers' report was then transmitted by the Secretary of the Army to the Speaker of the House of Representatives. H.D.No.549, at p. 12. Also conveyed to the House were comments submitted by various interested agencies, including the Federal Power Commission. With respect to the Corps' proposal to install a 7,000 kilowatt generator at Stockton Dam, the FPC noted that "further studies at the definite project stage, . . . may show the desirability of installing somewhat larger capacities than the 7,000 kilowatts . . . now proposed." H.D.No.549, at p. 9.

Four years after receipt of the Corps' report and recommendation, Congress passed the Flood Control Act of 1954, Public Law No. 83–780, 83rd Congress. The statute provides, in pertinent part:

The comprehensive plan for the Missouri River Basin approved by the Act of June 28, 1938, and as amended and supplemented, is hereby further modified to include the project for flood protection on the Osage River and tributaries, Missouri and Kansas, *substantially in accordance with the recommendations of the Chief of Engineers in House Document No. 549, 81st Congress.* [Emphasis added.]

In the years following the passage of the Flood Control Act of 1954, the Army Corps of Engineers recommended increases in the size of the hydroelectric generator to be installed at Stockton Dam, and the Congress invariably approved funding requests for these increases. In 1959 the Corps proposed and the Congress appropriated funds for the installation of an 8,000 kilowatt generator at Stockton Dam. The following year the Corps suggested that the generator be increased to 12,700 kw, and the Congress appropriated funds for a generator of that size. In 1961 a representative of the Corps testified that it would be feasible to construct a 33,770 kw generator in the Stockton project, and Congress appropriated funds in the amount necessary. In 1962, the Corps proposed and the Congress appropriated funds for the installation of a 35,000 kw generator at Stockton Dam. The following year the Corps suggested an increase in the size of the generator, and Congress appropriated funds for the installation of a 45,200 kw generator with an overload capacity of 15% (52,000 kw). Construction of the project commenced shortly thereafter.

It was not until the fall of 1972 that the events which prompted this lawsuit took place. At that time, the Corps discovered during a test release of water from the dam that the channel capacity of the Sac River immediately downstream from the dam was less than half of what had been previously calculated. The capacity of the Sac River channel downstream of the dam had been calculated as 12,000 cubic feet per second ("cfs"); generation of the overload capacity of 52,000 kw produces discharges of up to 11,000 cfs. The 1972 test release of 6,000 cfs resulted in an overflow at several places along the Sac River. The Corps subsequently recalculated the channel capacity of the Sac River and found that it is approximately 5300 cfs, less than half of that previously computed. At the time the Corps discovered the miscalculation in the channel capacity of the Sac River, construction of the Stockton project was virtually complete. From late 1972, when the Corps discovered its miscalculation of the channel capacity of the Sac River, to March 1973, when this action was filed, the Corps worked extensively with state and federal agencies and persons living along the Sac River downstream of the dam in an effort to resolve the problem with which it was confronted. After much investigation and discussion, in the spring of 1976 the Corps proposed to deal with the downstream flooding problem by (1) purchasing flowage easements on 1,337 acres of land downstream of the project, (2) constructing one channel cutoff, and (3) limiting discharges from the dam to 8,000 cfs for six hours' duration, thus generating some 40,000 kilowatts of electricity. In reports to and testimony before House and Senate committees and subcommittees in 1976, 1977, and 1978, the Corps fully disclosed to the Congress the downstream flooding problem and its proposed solution to the problem, and funds for the implementation of the proposed solution were appropriated.

This lawsuit was filed on March 22, 1978, some fifteen years after Congress appropriated funds for the construction of the Stockton project and for the installation of the generator presently in use, some five years after the downstream flooding problem was discovered, and two years after the Corps filed its final supplemental environmental impact statement on its proposed solution to the downstream flooding problem.

### B. *Discussion*

Plaintiffs contend that under the provisions of the 1954 Flood Control Act (the "Act"), *supra,* the Stockton project was intended primarily for flood control; generation of hydroelectric power was a secondary purpose. Plaintiffs argue that the Act provided for the installation of a 7,000 kilowatt generator in the dam, and that the Corps' installation of a generator with a capacity of 45,200 kilowatts and an overload capacity of more than 50,000 kilowatts is inconsistent with the Act. Relying upon the Administrative Procedure Act, 5 U.S.C. § 706 (1976), and the decision of the Supreme Court in *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), plaintiffs ask this Court to enjoin defendants from operating the Stockton Dam project in a manner inconsistent with the Act.

Defendants' response to plaintiffs' position is three-fold. First, defendants assert that the Court lacks jurisdiction to review the matter. Second, they deny that the construction of the 45,200 kilowatt generator in the dam is in any way inconsistent with the Act. Finally, notwithstanding the merits of plaintiffs' position, defendants contend that plaintiffs are barred by the equitable doctrine of laches or by the applicable statute of limitations[1] from contesting the installation of the generator presently in use at Stockton Dam. *See, Federal Defendants' Motion for Summary Judgment, etc.,* filed March 27, 1980.

 This Court clearly has subject matter jurisdiction over plaintiffs' claim that defendants' installation of the genera-

tor presently in use in Stockton Dam is inconsistent with the Flood Control Act of 1954. While Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702 (1976), "does not afford an implied grant of subject matter jurisdiction permitting federal review of agency action," *Califano v. Sanders,* 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1967), federal courts are vested with such jurisdiction under 28 U.S.C. § 1331(a). In 1976, § 1331(a) was amended to delete the requirement that there be $10,000 in controversy in cases brought against the United States. As the Supreme Court stated in *Califano v. Sanders, supra,* the "obvious effect" of the 1976 amendment to § 1331(a) "is to confer jurisdiction on federal courts to review agency action . . ." *Id.* at 105, 97 S.Ct. at 984; *Onan Corp. v. United States,* 476 F.Supp. 428, 432 (D.Minn.1979). Thus, federal courts have jurisdiction under § 1331(a) to review a challenge to federal agency action on the ground that it exceeds statutory authorization. *See,* 5 Mezines, Stein, and Gruff, *Administrative Law,* § 45.03 (1980). This Court accordingly holds that it has jurisdiction over Count IV of plaintiffs' complaint.

 As mentioned previously, defendants contend that plaintiffs are barred from challenging defendants' operation of the Stockton project by the applicable statute of limitations or, alternatively, by the equitable doctrine of laches. The Court recognizes the force of this argument, but it is unnecessary to reach those issues because it is clear that defendants' installation and operation of the hydroelectric generator at Stockton Dam is in no way inconsistent with the Flood Control Act of 1954.

Because this is a problem of statutory construction, analysis must begin with the language of the statute. The relevant provision of the Flood Control Act of 1954 authorizes construction of the Stockton project "substantially in accordance with the recommendations of the Chief of Engineers in House Document No. 549, 81st Congress." In that document, the Chief of

---

1. 28 U.S.C. § 2401(a) (1976).

Engineers had concurred with the recommendations of the Board of Engineers, which in turn had agreed with the recommendation of the District Engineer that a hydroelectric power plant be installed in the Stockton Dam and that the size of the plant be subject to modifications which might later prove to be desirable.

It is well recognized that Congress customarily approves flood control projects on the basis of preliminary plans submitted by the Corps of Engineers, and authorizes the Chief of Engineers to make such modifications as later studies indicate are necessary. As the Fifth Circuit Court of Appeals has noted, a preliminary report such as H.D. No.549 is "only preliminary feasibility report and [is] not binding on the Corps or the Secretary of the Army." *United States v. 2606.84 Acres of Land in Tarrant County, Texas,* 432 F.2d 1286, 1292 (5th Cir. 1970), *cert. denied* 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658, *reh. denied,* 403 U.S. 912, 91 S.Ct. 2203, 29 L.Ed.2d 690 (1971). The Congress has expressed confidence in the Corps' exercise of its discretion in these matters.[2]

Here, of course, the Corps is expressly vested with discretion to construct the project with such modifications as are necessary or desirable. A similar case was prosecuted in *United States v. 2606.84 Acres of Land, etc., supra.* There, Congress passed legislation for the construction of flood control project on the Trinity River near Fort Worth, Texas. The Corps built a substantially larger dam than that originally envisioned, and condemned plaintiff's land for recreational use, a use not mentioned in the authorizing legislation. In upholding the taking as valid, the Fifth Circuit Court of Appeals noted:

The Secretary of the Army and Chief of Engineers were authorized to deviate from the plans in H.D. 403. Therefore the fact that Benbrook Dam and Reservoir as actually built was approximately three miles away from the site suggested in H.D. 403, was considerably larger, and was significantly more costly did not deprive the Secretary of the Army of the authority to build the dam. [Citation omitted.] It is undisputed that some authorization was for a flood control project on the Clear Fork of the Trinity River. This is what the Corps of Engineers built. The area served and the project purposes were not changed... Mere changes in the plans and specifications of the dam and reservoir did not render arbitrary and capricious the discretion exercised by the Secretary of the Army and the Chief Engineer pursuant to H.D.403 nor did such changes render their actions without authority. In projects of this sort there is a built-in margin for error, leaving room for necessary changes. We hold therefore that the project as built was authorized by Congress in Public Law 14 even though it did not conform exactly to the plans contained in H.D.403.

*Id.* at 1293; *Allison v. Froehlke,* 470 F.2d 1123, 1126–1127, (5th Cir. 1972).

The evidence of record in the case at bar establishes that, at the request of the Congress, the Corps submitted a report (H.D.No.549) recommending the construction of a dam and hydroelectric power generator on the Sac River near Stockton, Missouri. In this preliminary report, the Corps suggested the installation of a 7,000 kilowatt generator in Stockton Dam, but noted that modification and expansion of the gen-

---

2. The House of Representatives was advised by the Flood Control Committee in a 1946 report that

> it has been the policy of the Flood Control Committee and the Congress to recognize that changing conditions often made plans obsolete, and to avoid undue rigidity they have given the Secretary of War and the Chief of Engineers the authority to modify plans as may be found necessary and desirable. The committee finds that his confidence and responsibility has been carefully exer-

> cised, and that modifications approved by the Chief of Engineers and the Secretary of War are only those which are clearly within the established policies of the Congress.

H.R.Rep.No.2165, Authorizations for Reservoirs, Levees, and Flood Walls for Flood Control, Flood Control Act of 1946, 79th Cong. 2d Sess., May 29, 1946; *quoted in Environmental Defense Fund, Inc. v. Alexander,* 467 F.Supp. 885, 889 (N.D.Miss.1979), *aff'd.,* 614 F.2d 474 (5th Cir. 1980).

erator might later prove to be advisable. It accordingly recommended that the Secretary of the Army and the Chief of Engineers be vested with some discretion to modify the project if such modifications appeared to be desirable. The evidence further establishes that the Congress approved the project in 1954 "substantially in accordance" with the Corps' recommendations. Further studies conducted over the course of the next decade suggested to the Corps that an enlargement of the generator at Stockton Dam might be both feasible and desirable. Representatives of the Corps, in testimony before the congressional committees, advised them of these changes and, later, of the downstream flooding problem and its proposed solution to the problem. On every occasion, the Congress approved the Corps' requests for funding the Stockton project.[3]

On this record, the Court finds that defendants' installation and operation of the hydroelectric generator presently in use at Stockton Dam, and defendants' proposed solution to the downstream flooding problem, are consistent with the Flood Control Act of 1954. Here, as in *United States v. 2606.84 Acres of Land, etc., supra*, "the project as built was authorized by Congress ... even though it did not conform exactly to the plans in [the pertinent House Document]." *Id.* Defendants have in no way exceeded their statutory authority in proceeding as they have. The Court will therefore enter judgment for defendants on Count IV of plaintiffs' complaint.

## II.

The Court now turns to a consideration of the question whether defendants have violated any of the environmental statutes involved in this case. Plaintiffs contend that defendants have failed to comply with the

requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* (1976), the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 *et seq.* (1976), and federal and state water quality laws. For the reasons set forth below, the Court finds that defendants have fully complied with the requirements of these statutes.

### A. The National Environmental Policy Act of 1969

Under Section 101 of the National Environmental Policy Act of 1969 ("NEPA"), federal agencies are to employ all practicable means, consistent with other essential considerations of national policy, to improve and coordinate federal plans, functions, programs, and resources in order to achieve various environmental goals. 42 U.S.C. § 4331(a). Section 102 of NEPA, 42 U.S.C. § 4332, sets forth procedural requirements applicable to federal agencies planning "major federal actions significantly affecting the quality of the human environment." The agency must, among other things, "utilize a systematic, interdisciplinary approach ... in planning and decision-making," prepare a detailed environmental impact statement ("EIS") on the proposed action, and "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." § 4332(2)(A)–(C). The EIS must describe, in detail

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environ-

---

**3.** In this connection, the Court notes that where an agency's interpretation of an enabling statute is not plainly inconsistent with the terms of that statute, a reviewing court is bound to give it great deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Blue Cross Ass'n. v. Harris*, 622 F.2d 972, 978 (8th Cir. 1980). Furthermore, "[a]ppropriation by Congress of funds

for agency action in the face of a construction placed upon an enabling act by the agency has the effect of ratifying the agency action when the agency construction is consistent with the purpose of the legislation." *Young v. Tennessee Valley Authority*, 606 F.2d 143, 147 (6th Cir. 1979), *cert. denied*, 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 776 (1980).

ment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved if the proposed action should be implemented.

§ 4332(2)(C).

The Council on Environmental Quality ("CEQ") has promulgated guidelines for the preparation of environmental impact statements. The applicable CEQ guidelines are those published in the Federal Register on August 1, 1973, at 38 F.R. 20550 *et seq.*[4] The Eighth Circuit Court of Appeals has indicated that the CEQ guidelines are to be accorded substantial weight in reviewing compliance with NEPA, *MPIRG v. Butz*, 541 F.2d 1292, 1299 n. 15 (8th Cir. en banc 1976), and the Corps' own regulations state that its environmental impact statements should be based in large part upon the CEQ guidelines. 33 C.F.R. § 209.410(i)(7) (1979).

■■■ It is undisputed that the requirements of NEPA apply to some degree to the Stockton project notwithstanding that the project was initiated long before the passage of that statute. *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 17 n. 3 (8th Cir. 1973); *Jicarilla Apache Tribe v. Morton*, 471 F.2d 1275, 1282 (9th Cir. 1973). While it may become "impracticable to reassess the basic course of the action where the project was initiated prior to the effective date of NEPA," *Environmental Defense Fund v. Corps of Engineers, U. S. Army*, 470 F.2d 289, 296 (8th Cir. 1972), *cert. denied*, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973), the requirements of § 4332(2)(c) nevertheless apply to the maximum extent practicable to major federal

actions taken after January 1, 1970. *Indian Lookout Alliance v. Volpe, supra,* at 296 n.11, quoting the 1971 CEQ guidelines; *Sierra Club v. Morton*, 400 F.Supp. 610 (N.D. Cal.1975), *aff'd in part and rev'd in part*, 610 F.2d 581 (9th Cir. 1979).

The Corps, recognizing this, filed a draft and final EIS on the operation and maintenance of the Stockton Dam project and a draft and final supplemental EIS on the proposed solution to the downstream flooding problem. The question before the Court is whether the Corps complied with the procedural and substantive requirements of NEPA.

■■ Courts are to engage in both procedural and substantive review of a federal agency's efforts to comply with NEPA. The Eighth Circuit Court of Appeals has held that

the test of compliance with the procedural provisions of § 102(2)(C) is one of good faith objectivity. The touchstone of our inquiry is reason .... [T]he EIS need contain only sufficient information to permit a reasoned choice of alternatives.

*MPIRG v. Butz, supra* at 1300 (citations omitted); *see Environmental Defense Fund v. Corps of Engineers, supra; Iowa Citizens For Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 852 (8th Cir. 1973). NEPA "imposes upon agencies duties that are 'essentially procedural.'" *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980), *quoting from Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). In reviewing the substance of the agency's decision, the court may not substitute its judgment for that of the agency. Instead, it must

---

4. These regulations were in effect at the time the Corps prepared and filed the environmental impact statements complained of here. The CEQ guidelines were amended in 1978, but the revised version did not take effect until mid 1979. The 1978 amendments are not retroactive. Section 1506.12 of the 1978 amendments provides, in pertinent part:

These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective

date of these regulations. No completed environmental documents need be redone by reasons [sic] of these regulations. Until these regulations are applicable, the Council's guidelines in the Federal Register of August 1, 1973, shall continue to be applicable. 40 C.F.R. § 1506.12 (1980). Thus, in reviewing the adequacy of the environmental impact statements filed in the case at bar, the Court must look to the CEQ guidelines issued in August 1973.

determine whether the agency reached its decision after a full, good faith consideration and balancing of environmental factors. [citations omitted] The court must then determine whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values.

*MPIRG v. Butz, supra,* at 1300. It is well settled in this Circuit that "it is not the function of the federal court ultimately to pass on the merits of the contemplated action," but rather to consider whether the "agency action . . . passes muster under the scope of review provisions of the Administrative Procedure Act, 5 U.S.C. § 703." [5] *Farmland Preservation Association v. Goldschmidt,* 611 F.2d 233, 237 (8th Cir. 1979). With these considerations in mind, the Court turns to a review of defendants' actions in the case at bar.

The evidence adduced at trial established that in its natural state, the flow of the Sac River downstream of the Stockton Dam generally ranged between 900 and 1100 cfs, with a mean flow of 960 cfs. After heavy rains, of course, the flow of water in the river was much higher. In bluff-to-bluff floods, the rate of flow was approximately 15,000 cfs. There was testimony that on one occasion in 1943, the rate of flow in the Sac River was as high as 140,000 cfs.

The construction of the Stockton Dam had the intended effect of channeling flood waters and other precipitation into the Stockton reservoir for release into the Sac River at carefully regulated intervals. Release of water through the generator installed in the dam produces hydroelectricity. Generation of the nameplate capacity of 45,200 kilowatts requires a discharge of between 7,000 and 9,300 cfs. A discharge of up to 11,000 cfs is required to generate 52,000 kilowatts, which is the generator's capacity. Such discharges might have caused few problems had the channel capacity of the Sac River been 12,000 cfs as originally calculated, but upon the discovery that the channel capacity of the Sac River downstream of the dam is actually 5300 cfs, the Corps found it necessary to decrease the anticipated flow regimen. Pending approval and implementation of its proposed solution to the downstream flooding problem, the Corps has voluntarily limited its releases of water into the Sac River channel to 5000 cfs. The Corps' proposed solution to the downstream flooding problem is to limit the releases for hydropower production to 8,000 cfs, thereby producing about 40,000 kw of electricity. Because the channel capacity of the Sac River just below the dam is only 5300 cfs, the Corps also proposes to purchase sloughing easements in approximately 1300 acres of land along the river and to construct one channel cutoff downstream of the dam.

The experts who testified at trial were generally in agreement that the Stockton project has had and will continue to have some adverse effects upon the environment. Of the adverse effects downstream of the dam, perhaps the most significant is erosion.

The evidence at trial established that there are several processes of erosion occurring on the Sac River. The construction of the dam caused some erosion, because the direction of all flood waters into one river channel tends to increase the flow of water in that channel, thereby causing some erosion of the silty clay loam of which the channel is largely comprised. The rapid rise and fall of the water level during hydropower production also contributes to erosion of the river channel. At the beginning of a cycle of hydropower production, the high rate of discharge from the dam causes the water level in the Sac River to rise rather rapidly. The rising water removes

---

**5.** The Administrative Procedure Act provides, in pertinent part:

 The reviewing court shall—

 \*　　\*　　\*　　\*　　\*　　\*

 (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 \*　　\*　　\*　　\*　　\*　　\*

(D) without observance of procedure required by law . . .

5 U.S.C. § 706 (1976).

the top layer of soil from the river bank, a process known as "soil plucking." Some of that soil is redeposited downstream, but much of it is deposited as far downstream of the dam as the Truman Reservoir, a lake created by a dam of the Osage River near Clinton, Missouri. After the production of hydropower ceases, the water level in the river falls quickly, as much as six feet in one hour. The soil along the banks which is then waterlogged, tends to slump into the river, causing scalloping of the banks; this phenomenon is described as "bank slumping." A less important factor in the erosion of the river channel is the velocity of water discharged from the dam.

There was substantial difference of opinion among the expert witnesses as to the erosive effect of discharges of water into the Sac River channel downstream of the dam. Thomas Aley, a hydrologist called by plaintiffs, testified that in his opinion the rate of erosion immediately downstream from the Stockton Dam is now ten times that occurring naturally. He added that in his opinion 90% of the erosion of the river channel to date is caused by discharges of water from the dam. On the other hand, Robert Pearce, an expert in channel hydraulics and photogrametry, testified on behalf of defendants that his study of the river channel indicated that the present rate of erosion may not be higher than it was prior to the construction of the dam. He stated that the Sac River channel appears to be more badly eroded than it is because the regular rise and fall of water level associated with hydropower production does not permit revegatation of the banks. The absence of plant cover may lead a person studying aerial photographs of the river to conclude that the rate of erosion has increased dramatically. John Moylan, a geomorphologist called by defendants agreed with Mr. Pearce's assessment of the utility of aerial photographs in cases such as this. Mr. Aley's conclusions were based in large part upon such aerial photographs.

Although releases of 5000 cfs have apparently resulted in some acceleration of the rate of erosion in the Sac River, it is not clear just how defendants' proposal to increase discharges to 8000 cfs will affect the rate of erosion. Unfortunately, at present there is no way to predict, with assurance, changes in the rate of erosion. Walter Linder, an expert in open channel hydraulics, testified that if the velocity of the water increases, the rate of erosion, might also increase, but he was not able to predict to what extent the rate of erosion would increase at 8000 cfs.

■ Plaintiffs allege that defendants' environmental impact statements are inadequate in their assessment of the project's effect upon the rate of erosion in the Sac River. The Court disagrees. Both the project EIS (at paragraphs 4.31 and 5.01) and the supplemental EIS (at paragraph 4.01) state that erosion will increase as a result of hydropower generation. The Court does not find credible Mr. Aley's testimony that the rate of erosion has increased 1000% since hydropower generation began and finds that, while erosion has increased, the rate of increase is much less. This fact is reflected in both environmental impact statements, and the Court finds the environmental impact statements prepared by defendants to be adequate on this point.

The evidence at trial also established that the quality of the water downstream of Stockton Dam has diminished somewhat since construction and operation of the hydroelectric generator began. Water discharged through the generator tends to come from lower levels of the Stockton Reservoir, and is therefore rather low in oxygen. Defendants' construction of a skimming weir in the reservoir has in large part corrected this problem. The water discharged from the dam now has an oxygen level which is well within acceptable levels. Although the water immediately downstream of Stockton Dam is exceptionally clear, as the water moves downstream it becomes more turbid. Turbidity is one optical quality of water; turbid water is somewhat cloudy, reducing the light available for photosynthesis by aquatic plants and making it more difficult for predator fish to

hunt. The erosion of the Sac River channel has also increased the level of suspended solids in the water, but the evidence submitted at trial established that the level of suspended solids in the water is within state water quality.

■ These adverse effects upon the water quality downstream of Stockton Dam are adequately reflected in defendants' environmental impact statements. *See,* ¶ 4.31, 4.33, and 5.02 of the Project EIS; ¶ 4.05 of the Supplemental EIS.)

■ Operation of the Stockton Dam hydroelectric power generator has also affected fish and wildlife downstream of the dam. Populations of fish normally found in fast moving streams have diminished, and populations of fish more suited to the environment now found downstream of Stockton Dam have increased. These changes are adequately documented in defendants' environmental impact statements. *See,* ¶ 2.17, and 4.30 in the Project EIS; ¶ 4.04–4.07 of the Supplemental EIS. There is also some adverse effect upon waterfowl and certain wildlife such as beaver. The testimony of Quentin Walsh, an employee of the plaintiff Missouri Department of Conservation, that both the wood duck and the beaver populations have declined somewhat since generation began in 1972 does not in any way undermine defendants' statement in the Supplemental EIS, at paragraph 4.03, that this loss is relatively insignificant. The Court finds that defendants' environmental impact statements adequately document the adverse consequences of the operation of the Stockton project upon fish and wildlife.

Plaintiffs also contend that neither environmental impact statement adequately addresses adverse environmental impacts downstream of Caplinger Mills, a town 16 miles downstream of the dam. In this regard the Court notes that federal agencies do not have unlimited time and resources to devote to the preparation of environmental impact statements, *see MPIRG v. Butz, supra,* at 1300; as Judge Van Oosterhout has observed,

[t]he discussion of environmental effects need not be "exhaustive" but rather need

only provide sufficient information for a "reasoned choice of alternatives" . . . [NEPA] does not require that "each problem be documented from every angle to explore its potential for good or ill." *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra,* at 852; *quoting from Natural Resources Council, Inc. v. Morton,* 458 F.2d 827, 836 (D.C.Cir.1972), and *Sierra Club v. Froehlke,* 345 F.Supp. 440, 444 (W.D.Wis.1972).

Here, the evidence established that as yet there have been few adverse environmental effects downstream of Caplinger Mills. All of the flooding problems have been upstream of Caplinger Mills, and there have been no significant increases in erosion, degradation of water quality, or adverse effects upon fauna or water quality downstream of Caplinger Mills. While there was some evidence that implementation of defendants' proposed solution to the downstream flooding problem might cause some degradation of the river downstream of Caplinger Mills, it does not appear that the adverse effects will be substantial. For example, Mr. Linder testified that the construction of the channel cutoff upstream of Caplinger Mills will not cause severe erosion downstream; the river is relatively straight just upstream of the proposed cutoff and there is a pool near there created by a small dam near Caplinger Mills, so that the erosive effect of the water at that point along the river will tend to be diminished.

Several representatives of the Corps testified that studies of the area downstream of Caplinger Mills are now being conducted, and Colonel Curl stated that the Corps' interest in resolving the flooding problem upstream of Caplinger Mills made it desirable to defer a detailed discussion of effects downstream of Caplinger Mills until later. Louis Helm testified that the scope of the Supplemental EIS was confined to the area upstream of Caplinger Mills because erosion downstream of Caplinger Mills was minimal and the Corps had little baseline data on that area. No credible evidence suggests that the Corps' decision to focus its studies on the area upstream of Caplinger Mills

was made in bad faith or in an effort to segment the information required in an EIS into separate documents.

█ The project EIS accurately states that hydropower releases "will have an adverse effect on aquatic life in 36 miles of the Sac River below Stockton Dam." (Project EIS, at ¶ 5.02; see also ¶ 4.30.) The project EIS also states that the fluctuations in the water level of the river will "result in increased erosion, turbidity, and siltation" downstream of the dam. (¶ 5.02.)

The Court finds that these environmental impact statements were sufficient to advise the District Engineer of possible adverse effects downstream of Caplinger Mills, and that they provided enough information to enable him to make a reasoned choice of alternatives. The District Engineer did not act improperly or abuse his discretion in deciding to defer further study of effects downstream of Caplinger Mills so that work on resolution of the flooding problem upstream could begin. The Court finds that the requirements of NEPA were met with respect to anticipated effects of defendants' proposed operation of the Stockton project on the area downstream of Caplinger Mills.

Plaintiffs further contend that defendants fail to provide an adequate assessment of the economic value of the lost agricultural production should the proposed solution be implemented.

█ Under its proposed solution to the downstream flooding problem the Corps plans to purchase sloughing easements on 1337 acres of land downstream of the dam. The supplemental EIS indicates that approximately 350 acres of this land lie in the river channel, 150 acres of farmland and 100 acres of timber will be flooded, 235 acres will be isolated during generation, and 502 acres will be used for blocking and construction. (Supplemental EIS, at ¶ 1.04 and ¶ 5.07.) The Corps estimated the annual loss of income from the 150 acres of agricultural land to be flooded at $14,556. (Supplemental EIS, at ¶ 4.08, Table 4–1.) The Supplemental EIS also indicates that because farmers' access to the 235 acres

expected to be isolated during generation will be limited, agricultural production on those acres will be impaired. (Supplemental EIS, at ¶ 4.08.) Although it is true that the supplemental EIS does not set forth, for a period of more than one year the agricultural losses expected from implementation of the proposed solution, this does not in itself render the statement fatally defective. As Mr. Barber noted, the long-term value of the agricultural losses is taken into account in the cost of purchasing the sloughing easements. The Court finds that defendants' failure to set forth the value of the losses to agricultural land for a period longer than one year does not render the environmental impact statements inadequate.

█ Plaintiffs also challenge the environmental impact statements for defendants' alleged failure to include what plaintiffs consider to be a viable alternative to the proposed solution. Plaintiffs propose that the hydroelectric generator at Stockton Dam be operated as a run-of-the-river plant, producing about 7,000 kilowatts of energy with a discharge of between 900 and 1100 cfs. Defendants concede that this supposed alternative was not discussed in the environmental impact statements, but contend that the alternative need not be discussed because it is not reasonable. It is, of course, clear that all reasonably feasible alternatives to the proposed action must be considered in an environmental impact statement. *Farmland Preservation Association v. Goldschmidt, supra.* It must therefore be determined whether plaintiffs' proposed alternative is a reasonable one.

█ The credible evidence adduced at trial established two crucial facts: The generator presently in use at Stockton Dam will not run effectively at rates between 15,000 and 40,000 kilowatts, and it is infinitely more economical to run a hydropower plant such as that at Stockton Dam for peaking rather than baseload power. These two factors make it clear, and the Court finds, that plaintiffs' suggestion that the hydroelectric power plant at Stockton Dam be operated as a run-of-the-river plant is not reasonable.

Paul D. Barber, an engineer in defendants' employ, testified that the hydroelectric turbine at Stockton Dam does not run smoothly between 15,000 or 20,000 kilowatts and 40,000 kilowatts. The Corps attempted to remedy this problem by installing fins in certain of the tubes in the plant. This effort was unsuccessful. The generator presently in use in Stockton Dam is custom-made for that facility, with virtually no salvage value; tearing it out and replacing it with a generator which would work as a run-of-the-river generator would cost approximately $1,700,000.

The evidence adduced at trial is overwhelming that it is far more sensible economically and environmentally to run the Stockton Dam generator at a level exceeding 40,000 kilowatts. James McNabb, an engineer employed by the Associated Electric Cooperative ("AEC"), testified that the AEC whole sales electric energy to 41 district cooperatives in 112 counties in Missouri and that it has approximately 350,000 customers. The AEC works closely with the Southwest Power Administration ("SPA"), the marketing agency for hydroelectric peaking power. Mr. McNabb testified that the AEC buys 478,000 kilowatts a year, 25% of its peaking power needs and 6 to 8% of its total electric needs—from the SPA. This energy is in turn used to meet the needs of AEC's own customers.

Mr. McNabb testified that large coal-fired plants are very efficient at producing low-cost baseload electricity. Coal-fired plants are not, however, useful in meeting demand for electricity during periods of high demand. At such time, "peaking power" is necessary. Peaking power is necessary almost daily during summer and winter.

The need for peaking power is typically met by an oil-burning source, but oil is very expensive and continued dependence on oil is contrary to the energy policy of this country. Hydropower thus becomes a very attractive alternative, because it is quite inexpensive and can be produced almost instantly. Mr. McNabb testified that oil is 6 times as expensive as coal and 20 times as expensive as hydropower. Hydroelectricity costs .35 cents per kilowatt hour, while oil costs 7.5 cents per kilowatt hour.

Therefore, Mr. McNabb testified, it makes very little economic sense to run a hydroelectric power plant for baseload rather than peaking power. First, such an operation would have the effect of trading low-cost electricity for high-cost electricity. Second, during the transition from hydroelectricity to oil-produced electricity, consumers in the area served by the electric cooperative would be subjected to power curtailments. Finally, oil-fired generators are not without adverse environmental effects of their own.

The economic facts to which Mr. McNabb testified were confirmed by the testimony of other witnesses. Donald Hammon testified that even under the present flow regimen of 5,000 cfs, the cost of power benefits foregone, when capitalized, amounts to over $20,000,000. Under defendants' proposed operation of the project, the cost of power benefits foregone amounts to some $4,200,-000 when capitalized. Colonel Richard Curl, formerly the District Engineer, stated that plaintiffs' proposal to operate the Stockton project at less than 5,000 cfs is "into a range of absurdity as far as costs are concerned." (Tr. p. 890).

Plaintiffs' experts did not contradict the testimony of defendants' experts. Kenneth D. McCall and Dr. Louis Walker both testified that generation of 7,000 kilowatts would be marketable, but Mr. McCall conceded that the advantage of hydropower is the generation of peaking power.

On this record, the Court finds that plaintiffs' proposal to run the Stockton hydropower generator at a rate less than that proposed by defendants is unreasonable and need not be considered as an alternative in defendants' environmental impact statements. The environmental impact statements are not inadequate for failing to include plaintiffs' proposal as an alternative.

Throughout this litigation, the parties have focused their attention upon the foregoing criticisms of defendants' environmen-

tal impact statements. Upon a careful review of the statements and the evidence of record, the Court finds that plaintiffs' remaining criticisms of the statements' content are without merit. The Court therefore holds that the environmental impact statements prepared by defendants meet the requirements set forth in 42 U.S.C. § 4332(2)(C) and the applicable regulations.

Notwithstanding the adequacy of the content of defendants' environmental impact statements, plaintiffs contend that defendants have otherwise failed to comply with the procedural requirements of NEPA. That statute states that the agency shall use a "systematic, interdisciplinary approach ... in planning and decision-making," 42 U.S.C. § 4332(2)(A), and "consult with and obtain the comments of" related Federal agencies. 42 U.S.C. § 4332(2)(C). *See also* § 1500.8(c) and § 1500.9 of the applicable CEQ guidelines, at 38 F.R. 20554 (1973).

■ The Court finds that the evidence clearly establishes that the Corps used a "systematic, interdisciplinary approach" in preparing the environmental impact statements involved here and in making the decision to implement the proposed solution for the downstream flooding problem. As Mr. Cavin testified, in preparing the environmental impact statements at issue here the Corps called upon biologists, hydrologists, geologists, experts in cultural resources, real estate experts, ecologists, and design engineers. He testified that the persons involved in the preparation of these environmental report statements were encouraged to express their concerns about the matter and to debate them with their colleagues. The testimony of other experts involved in the preparation of these environmental impact statements confirmed that of Mr. Cavin. On this record, the Court finds that the Corps fully complied with the requirements of 42 U.S.C. § 4332(2)(A).

■ There remains the question whether the Corps sufficiently consulted with other interested and concerned agencies. In this regard the Court notes that defendants submitted into evidence records of extensive correspondence with the Department of Interior Fish and Wildlife Service, the Missouri Department of Conservation, the U.S. Environmental Protection Agency, and a variety of other interested persons and agencies. Defendants' Exhibits 37A, 37B. Furthermore, both final environmental impact statements contain comments solicited from these agencies with respect to the drafts of those statements, and the Corps included in the final statements its responses to those comments. The testimony of witnesses at trial served only to buttress the conclusion that the Corps met its obligation to consult with and request comments from appropriate federal, state, and local agencies. The Court accordingly finds that the Corps fully complied with the requirement of 42 U.S.C. § 4332(2)(C) that it consult with those agencies.

■ Having concluded that the environmental impact statements prepared by the defendants met the requirements of 42 U.S.C. § 4332(C), and that defendants have otherwise complied with the procedural requirements of NEPA, the Court now turns to a substantive review of the Corps' decision to deal with the downstream flooding problem by limiting hydropower generation discharges at 8,000 cfs, purchasing sloughing easements, and constructing a channel cutoff approximately one mile upstream of Caplinger Mills. It is, of course, well settled that the reviewing court may conduct only a limited scrutiny of the agency's decision. The issue here is not whether this Court would make the same choice as the Corps, but whether the Corps gave "full, good-faith consideration and balancing of environmental factors," *MPIRG v. Butz, supra*, at 1300, and whether its cost-benefit analysis is arbitrary or otherwise contrary to law.[6]

6. There is, however, no requirement that the decisionmaker be "subjectively impartial" or that he be free of an "institutional bias" in favor of completion and operation of a project already under construction. *Environmental Defense Fund v. Corps*, 470 F.2d 289, 295 (8th

■ The Court has previously found that plaintiffs' proposal that defendants operate the hydroelectric power plant at Stockton Dam as a run-of-the-river generator is not reasonable. The evidence is overwhelming that the adverse environmental effects resulting from defendants' proposed method of operation of the project are far outweighed by the benefits to be reaped from operation of the generator for peaking rather than baseload power. Plaintiffs introduced little evidence of the advantages of the other alternatives available to defendants, but rather focused their attention on the supposed desirability of operation of the generator as a run-of-the-river plant. Upon a careful review of the evidence, the Court finds that defendants did not act arbitrarily, capriciously, or in bad faith in selecting the alternative they did from the choices available to them, and that in making that decision defendants gave full, good-faith consideration to and balanced the environmental factors involved.

For the reasons set forth above, the Court finds that defendants have complied in every way with the procedural and substantive requirements of the National Environmental Policy Act of 1969 and the Administrative Procedure Act. Judgment will accordingly be entered for defendants on Count I of plaintiff's complaint.

### B. The Fish and Wildlife Coordination Act

Under the provisions of the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq. (1976), federal agencies proposing to modify the waters of any stream must "consult with the United States Fish and Wildlife Service, Department of Interior," 16 U.S.C. § 622(a), and give "full consideration" to reports by concerned federal and state agencies on the wildlife aspects of the project. Furthermore, the agency planning the project must "include such justifiable means and measures for wildlife purposes" as are necessary to maximize project benefits.[7] § 662(b).

These requirements largely duplicate those imposed by NEPA. As the Eighth Circuit Court of Appeals has held, "if the Corps complies with NEPA in good faith, it will 'automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately.'" EDF, Inc. v. Froehlke, 473 F.2d 346, 356 (8th Cir. 1972), quoting from EDF, Inc. v. Corps of Engineers of the U.S. Army, 325 F.Supp. 749, 754 (E.D.Ark.1971).

■ The Court has previously found that defendants have fully complied with the requirements of NEPA. This being so, it follows from the reasoning in EDF, Inc. v. Froehlke, supra, that the Corps has also met the requirements of the Fish and Wildlife Coordination Act. Judgment will therefore be entered for defendants on Count II of plaintiffs' complaint.

### C. Federal and State Water Pollution Control Laws

In Count III of their complaint, plaintiffs allege that defendants' operation of the hydroelectric generator at Stockton Dam vio-

---

Cir. 1972). All that is necessary is that he meet the test of good-faith objectivity. Id., at 296.

**7.** Defendants are making an effort to minimize adverse effects of the operation of the Stockton project upon fish and wildlife. For example, the Corps will attempt to minimize the adverse impact of hydropower releases upon the spawning of fish below the dam by regulating downstream releases during that period. Project EIS, at ¶ 4.448. And both hunting and haying will be regulated to "enhance and protect various species of wildlife such as bobwhite, quail . . ." Project EIS, at ¶ 4.51. There is no indication that these effects to reduce losses to fish and wildlife will not continue.

·In this connection, the Court notes that the Fish and Wildlife Coordination Act,

 only requires that the Corps attempt to mitigate losses by discussing and consulting with the appropriate state and federal agencies. The Corps, although it may recommend mitigation plans to Congress, has no authority to provide for mitigation under this Act in the absence of specific Congressional authorization.

Cape Henry Bird Club v. Laird, 359 F.Supp. 404, 417–418 (W.D.Va.1973), aff'd, 484 F.2d 453 (4th Cir. 1973).

lates the Missouri Clean Water Law, § 204.-016, RSMo.Supp.1978 ("MCWL"). Plaintiffs contend that under the provisions of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251 *et seq.* (1976), defendants must operate the dam, reservoir, and power plant so that they do not violate Missouri water quality standards. (Plaintiffs' Complaint, at ¶ 76.)

The FWPCA provides, in pertinent part, that each federal agency "(1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the *discharge or runoff of pollutants,* . . . shall be subject to, and comply with, all Federal, State, interstate, and local" water quality laws. 33 U.S.C. § 1323(a) (emphasis supplied). Thus, the Corps is not subject to the requirements of the MCWL unless it is found to be causing the "discharge or runoff of pollutants."

The FWPCA defines "pollutants" as, among other things, "rock, sand, [and] cellar dirt." 33 U.S.C. § 1362(6). "Discharge of a pollutant" is defined in pertinent part as "any addition of any pollutant to navigable waters from any point source." § 1362(12).

■ "Point source" is defined as "any discernible, confined and discrete conveyance," such as a pipe or tunnel. 33 U.S.C. § 1362(14). Defendants' operation of the Stockton project clearly does not involve or result in the "discharge of a pollutant" as that term is defined in the FWPCA. Thus, defendants are subject to Missouri water quality standards only if they are found to be engaged in activity resulting in the "runoff" of a pollutant.

Unfortunately, "runoff" is not defined in the FWPCA, and the Court's attention has been directed to no case interpreting the term as it is used in that statute. It is, of course, a commonplace of statutory construction that "unless otherwise defined,

words [in a statute] will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Levings v. Califano,* 604 F.2d 591, 593 (8th Cir. 1979). The term "runoff" ordinarily refers to the flow of excess precipitation (such as rain or snow) into a stream.[8]

■ The evidence in the case at bar establishes that operation of the hydroelectric generator at Stockton Dam involves the discharge of several thousand cfs of water into the river channel below the dam, and that the associated rise and fall of the water level in the river dislodges and carries away silt and other material defined as "pollutants" under the FWPCA. The Court does not, however, find that this phenomenon constitutes the "runoff of a pollutant" within the meaning of the FWPCA. This being so, the Corps' operation of the Stockton project is not subject to state and local water quality laws under § 3123(a) of the FWPCA. Judgment will therefore be entered for defendants on Count III of plaintiffs' complaint.

### III.

■ Finally, plaintiffs contend that defendants' operation of the hydroelectric power plant at Stockton Dam constitutes a continuing nuisance subject to abatement by order of the court.

Nuisance is commonly defined as a "wrong arising from an *unreasonable or unlawful* use of property to the discomfort, annoyance, inconvenience or damage of another, and usually comprehends continuous or recurrent acts." *Meinecke v. Stallsworth,* 483 S.W.2d 633, 637 (Mo.App.1972) (emphasis supplied). Plaintiffs cannot prevail upon the theory of nuisance because defendants' activities are neither unlawful or unreasonable.

---

8. "Runoff" is defined in Webster's Seventh New Collegiate Dictionary (1963) as "the portion of the precipitation on the land that ultimately reaches streams; *esp.* the water from rain or melted snow that flows over the surface." It is defined in the Random House Dictionary of the English Language, Unabridged Edition (1971), as "something that drains or flows off, as rain which flows off the land in streams." *See also* Concerned Residents of Buck Hill Falls v. Corant, 388 F.Supp. 394, 403 (M.D.Pa.1975), wherein runoff is defined as "rainfall less the sum of water stored in the ground and water evaporated."

This Court has previously determined that defendants' operation of the Stockton Dam hydroelectric power plant is fully authorized by law; "the rule in this regard is that the courts will not hold conduct to constitute a nuisance where authority therefore exists by virtue of legislative enactment." *Smith v. Tennessee Valley Authority*, 436 F.Supp. 151, 154 (E.D.Tenn. 1977). *See, Potomac River Association, Inc. v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344, 359 (D.Md.1975); *Boccardo v. United States*, 341 F.Supp. 858, 865 (N.D.Cal.1972). Second, on record the Court cannot find that defendants' conduct is unreasonable. Finally, the harms experienced by plaintiffs as a result of defendants' operation of the Stockton project are clearly outweighed by the harms which would be suffered by the public if this Court should enjoin defendants' operation of the Stockton project under the proposed plan. Judgment must therefore be entered for defendants on plaintiffs' claim of nuisance.

## IV.

## CONCLUSION

Pursuant to the foregoing findings of fact and conclusions of law, the Court will enter judgment for defendants and against plaintiffs on all counts of plaintiffs' complaint and on plaintiffs' theory of nuisance.

It is accordingly

ORDERED that the Clerk enter judgment for defendants and against plaintiffs with respect to all causes of action set forth in plaintiffs' complaint.