STATE OF MISSOURI ex rel. John ASH-CROFT, Missouri Clean Water Commission, Department of Natural Resources, The Missouri Conservation Commission, Appellants,

Dale Rountree, Max A. Smith, Calvin C. Johnson, Alton Burns, James E. Jones, Kenneth D. McCall, Ray Pinkman, Shelby A. Masters, Scott Johnson and David Johnson,

v.

DEPARTMENT OF THE ARMY, Corps of Engineers, Clifford Alexander, Jr., Lt. Gen. John W. Morris and Col. Richard Curl, Appellees.

STATE OF MISSOURI ex rel. John ASH-CROFT, Missouri Clean Water Commission, Department of Natural Resources, The Missouri Conservation Commission,

Dale Rountree, Max A. Smith, Calvin C. Johnson, Alton Burns, James E. Jones, Kenneth D. McCall, Ray Pinkman, Shelby A. Masters, Scott Johnson and David Johnson, Appellants,

v.

DEPARTMENT OF THE ARMY, Corps of Engineers, Clifford Alexander, Jr., Lt. Gen. John W. Morris and Col. Richard Curl, Appellees.

Nos. 81–1224, 81–1225.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1981.

Decided March 9, 1982.

John Ashcroft, Atty. Gen., Jerry Short, Asst. Atty. Gen., Jefferson City, Mo., for appellants.

Joseph B. Phillips, Stockton, Mo., for Class Action appellants.

William B. Ellis, Hunton & Williams, Richmond, Va., for amici curiae.

J. Whitfield Moody, U. S. Atty., E. Eugene Harrison, Asst. U. S. Atty., August V. Spallo, Terence J. Kelley, Asst. Dist. Counsels, U. S. Army Corps of Engineers, Kansas City, Mo., for appellees.

Before ROSS and STEPHENSON, Circuit Judges, and HOWARD,[*] District Judge.

STEPHENSON, Circuit Judge.

Plaintiff-appellants representing the state of Missouri and affected landowners appeal the district court's[1] denial of relief from defendants-appellees Department of the Army, Corps of Engineers. Appellants allege the Corps of Engineers acted without authority in constructing a 45,200 kilowatt (kw) generator on the Sac River near Stockton, Missouri. The district court, in a well-reasoned and thorough opinion, denied relief on all grounds. *State of Missouri v. Department of the Army, Corps of Engineers,* 526 F.Supp. 660 (W.D.Mo.1980). We affirm the district court's denial of relief for the reasons set out in its opinion with some additional comment.

## I. FACTS

Through the passage of the Flood Control Act of 1954, Congress authorized the Army Corps of Engineers to construct a dam and generator near Stockton, Missouri, on the Sac River. This authorization was pursuant to an extensive study completed during the 1940's by the Corps of Engineers. It recommended an extensive construction program calling for the erection of a series of dams, primarily for flood control, on the Missouri, Kansas, and Osage Rivers and the tributaries of the Osage River.

Originally, the Corps of Engineers recommended a 7000 kw generator be placed at the Stockton dam. However, as the years passed, the Corps of Engineers increased the recommended size of the generator several times.[2] Each of the changes in the generator size was included in the Corps of Engineers' requested appropriation for that year and each time Congress approved the request.

The last increase was sought in 1963, when the Corps of Engineers requested an appropriation for a 45,200 kw generator with an overload capacity of 52,000 kw and Congress approved it. To operate the generator at 45,200 kw production, there must be a flowage of 11,000 c.f.s. and to operate the generator at the capacity of 52,000 kw requires a release of 14,000 c.f.s.

Construction of the project began soon after Congress passed the 1963 appropriation. A test release of water from the dam in 1972 revealed that the Corps of Engi-

---

[*] The Honorable George Howard, Jr., United States District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

[1] The Honorable William R. Collinson, Senior United States District Judge for the Eastern and Western Districts of Missouri.

[2] In 1959, Congress appropriated funds for an 8,000 kw generator. The following year the Corps of Engineers suggested, and Congress appropriated, funds for an increase in the size of the generator to 12,700 kw. In 1961, the generator's size again increased, this time to 33,700 kw. In 1962, Congress appropriated funds for a 35,000 kw generator. Finally, in 1963, Congress and the Corps of Engineers settled on the present 45,200 kw generator with an overload capacity of 52,000 kw.

neers had grossly overestimated the channel capacity of the river below the dam. The release of 6,000 c.f.s. resulted in an overflow at several places along the Sac River. Upon further investigation, the Corps of Engineers discovered the flowage capacity of the river was 5,300 c.f.s. instead of the 12,000 c.f.s. that the Corps of Engineers had originally estimated. At the time the Corps discovered the miscalculation in the channel capacity of the Sac River, construction of the Stockton project was virtually complete.

As a result of the downstream flooding, the Corps of Engineers considered various solutions to the problem, including the construction of levees or a re-regulation structure, widening or deepening the channel, or constructing one or more channel cut-offs to shorten the stream's length. Operation of the generator at rates between 15,000 kw and 40,000 kw is not a feasible alternative because of vibration. The Corps of Engineers, however, agreed to limit discharge to 5,000 c.f.s., pending resolution of the problem.

In the spring of 1976, after extensive investigation and discussion with state and federal agencies and persons living along the Sac River downstream of the dam, the Corps of Engineers proposed a solution composed of (1) purchasing flowage easements on 1337 acres of land downstream, (2) constructing one channel cut-off and (3) limiting discharges from the dam to 8,000 c.f.s. for six hours' duration thereby generating some 40,000 kw of electricity. The Corps of Engineers presented testimony and reports to House and Senate committees and subcommittees from 1976 through 1978. Funds for the implementation of the proposed solution were subsequently appropriated by Congress.

Appellants filed this lawsuit on March 22, 1978, seeking declaratory, mandamus and injunctive relief from the operation and proposed operation of the Stockton dam power plant. Plaintiffs alleged that the defendants' operation and the proposed operation of the hydropower facilities were not congressionally authorized, constituted an actionable nuisance, and were in violation of the Administrative Procedure Act (APA), the National Environmental Policy Act (NEPA), the Fish and Wildlife Coordination Act (FWCA), Federal Water Pollution Control Act (FWPCA), and the Missouri Clean Water Law (MCWL).

After a trial without a jury, the district court found that the Corps of Engineers had complied with all the necessary procedures and laws. It concluded the Corps of Engineers had acted within its authority in installing the 45,200 kw generator and in implementing the compromise solution regarding its operation.

## II. ISSUES

Appellants landowners and the state of Missouri argue three general grounds for reversal based on the district court's alleged errors in failing to hold that (1) the Corps of Engineers abused its discretion by acting in bad faith in the planning and installation of the 45,200 kw generator or, even if the action was not in bad faith, it was outside the congressional authorization; (2) the Corps of Engineers had not complied with the APA, NEPA and FWCA through its filing of the Final Environmental Impact Statement (FEIS) and the Final Supplemental Environmental Impact Statement (FSEIS); and (3) the solution would violate the FWPCA and state and local water pollution laws.

Appellant state of Missouri argues three additional grounds for reversal based on the district court's alleged errors in failing to hold that (1) the changes in the project were not within the congressional authorization, thus violating the APA and NEPA; (2) the Corps of Engineers had not fully complied with the FWCA for the reason that they did not adequately consult with the United States Fish and Wildlife Service and state agencies regarding adverse impacts; and (3) the operation and proposed operation of the dam constituted a nuisance.

## III.  DISCUSSION

### A.  *Abuse of Discretion—Outside Congressional Authorization*[3]

Appellant landowners contend that the installation of the large capacity generator was either grossly negligent or intentional. As evidence, they point to the Corps of Engineers' reliance on an inexperienced employee for the study of the river, the extreme misestimate of the flowage of the river, and the Corps of Engineers' numerous expansions of the capacity of the generator.

■ We find no error in the district court's finding that there was no gross negligence or intentional misconduct.  Obviously, mistakes were made in the design of the project.  However, appellants have not provided convincing evidence that these errors constituted grossly negligent or intentional actions.

Appellants landowners and the state of Missouri argue that even if the construction of the larger generator was not an abuse of discretion by being grossly negligent or intentional, it was action outside the authority granted to the Corps of Engineers by Congress.  Appellants argue that the primary purpose of the congressional authorization was flood control and, in light of the fluctuations in water levels that will result from the proposed operation, the Corps of Engineers has sacrificed the primary purpose of the project for power generation, which originally was intended to be only a secondary benefit.

Relying on *United States v. 2,606.84 Acres of Land in Tarrant County, Texas*, 432 F.2d 1286, 1292 (5th Cir. 1970), *cert. denied*, 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971), the district court held that the expansion of the capacity of the power generator was well within the congressional authorization.  In the *Tarrant County* case, the Fifth Circuit held that the

Corps of Engineers' expansion of the size of a reservoir for recreational purposes in a project primarily intended for flood control was not outside the congressional authorization for the project.  The district court in the present case reasoned that the *Tarrant County* decision shows the broad discretion given the Corps of Engineers in making changes in proposed projects.

■ While flood control may have been an important reason for the initial authorization of the project, we are not prepared to hold that the Corps of Engineers' action was outside the congressional authorization for the project.  Flood control was not the only reason for the project and the Corps of Engineers is given broad discretion in making changes in the preliminary plan for a project.  Furthermore, of great importance was congressional action from 1976 through 1978 in examining the problem, approving the compromise, and appropriating funds to implement it.  Congress thereby took an active role in designing and implementing the compromise.  After reviewing all the factors, we cannot say that the district court erred in rejecting the claim that the Corps of Engineers acted outside its authority.

■ In sum, based upon the district court's analysis and discussion, we agree that the changes were within the congressional authorization.  *See State of Missouri v. Department of the Army, Corps of Engineers, supra*, 526 F.Supp. at 668–69.  Also, upon a careful review of the evidence, we cannot say the district court erred in not finding an abuse of discretion by the agency through the alleged grossly negligent or intentional action of expanding the generator capacity.

### B.  *Environmental Issues*[4]

The landowners and the state of Missouri contend the Corps of Engineers has violated

---

**3.** Because of the similarity of the issues, we have combined appellants' contention that the Corps of Engineers acted in bad faith, thereby abusing their agency discretion, with appellant state of Missouri's contention that any changes

in the project were not within the congressional authorization.

**4.** In light of the similarity of the issues, we have combined appellants' general attack on the Final Environmental Impact Statement and

several environmental statutes. More specifically, they claim that the NEPA statements did not adequately assess the impact of the compromise solution between Stockton dam and Caplinger Mills, the statements improperly failed to determine the effects of the compromise on the river between Stockton and Caplinger Mills and particularly below Caplinger Mills, and the statements did not fully examine the reasonable alternative solutions. They also contend that the Corps of Engineers did not comply with the FWCA because it did not present an adequate mitigation plan to deal with the impact of the project on fish and wildlife as required by the FWCA and the agency did not adequately inform or consult with state and local agencies regarding the environmental impacts.

The landowners also argue that the FEIS and FSEIS were not filed at the time the Corps of Engineers proposed the compromise plan to Congress and that they were incomplete.

The district court held that the statements adequately assessed the effects of the proposed compromise operation on the portion of the river below the Stockton dam and properly evaluated alternative solutions. *Id.* at 669–73. The court also held that it was reasonable for the Corps of Engineers to not include the section of the river below Caplinger Mills, a town sixteen miles downstream of the dam, in its detailed examination of the impact that implementation of the proposed compromise would have on the river. The court noted that the statements containing this evaluation "need not be 'exhaustive' but rather need only provide sufficient information for a 'reasoned choice of alternatives.'" *Id.* at 673 (quoting *Iowa Citizens For Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 852 (8th Cir. 1973)).

The court further noted, "the evidence established that as yet there have been few adverse environmental effects downstream of Caplinger Mills. All of the flooding problems have been upstream of Caplinger

the Final Supplemental Environmental Impact Statement with the state of Missouri's chal-

Mills * * *." *State of Missouri v. Department of the Army, Corps of Engineers, supra,* 526 F.Supp. at 673. However, the project FEIS recognized that hydropower releases would "have an adverse effect on aquatic life in 36 miles of the Sac River below Stockton Dam." It also recognized that fluctuations in the water level would "result in increased erosion, turbidity, and siltation downstream of the dam." It was the district court's view that these environmental impact statements were sufficient to advise the district engineer of adverse effects downstream of Caplinger Mills and were adequate with respect to this area. *Id.* at 674.

■ We agree. After examining the statements and the district court's extensive discussion, we cannot say the agency's evaluation of the impact the compromise plan of operation would have on the river below Stockton dam or its evaluation of alternative solutions was inadequate.

The landowners contend that the FEIS and the FSEIS did not exist at the time the Corps of Engineers proposed its compromise to Congress. They argue that under NEPA, such statements are to be presented with the request for appropriation. The Corps of Engineers argues that the statements were not required in its request for appropriation to implement the compromise because the project predated NEPA. It contends that it submitted the FEIS and FSEIS only because the project was part of a continuing program initiated prior to the enactment of NEPA and finished after its effective date.

■ The district court found that authorization for the project had been given before enactment of NEPA. Furthermore, it noted that even though the basic course of the action could not be reassessed, a statement was to be filed to comply with NEPA "to the maximum extent practicable." *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 17 n.13 (8th Cir. 1973); *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275,

lenge based on the Fish and Wildlife Coordination Act.

1282–83 (9th Cir. 1973). The district court was satisfied that the Corps of Engineers' filing complied with NEPA to the extent necessary.

The FEIS was submitted in March 1975, and the FSEIS was filed in October 1976. In light of the fact that negotiations concerning possible solutions were continuing from 1976 through 1978, we cannot say the district court erred in finding the NEPA statements were in substantial compliance with the Act. *See Environmental Defense Fund, Inc. v. Corps of Engineers*, 470 F.2d 289, 296 (8th Cir. 1972). Tardiness in submitting the reports, if there was any, did not materially affect review and approval of the compromise project.

■ The landowners contend that the FEIS and FSEIS were incomplete because the Corps of Engineers failed to provide an adequate assessment of the economic value of loss of agricultural production, assigned an inappropriate life and interest rate to the project, did not properly assess the power benefits foregone, failed to properly consider the environmental consequences, provided an inaccurate description of the benefits of the project, failed to consider viable alternatives and, in general, submitted statements of poor quality.

The district court examined these contentions at length and found the FEIS and FSEIS were sufficient to comply with the environmental statutes, including NEPA and FWCA. It concluded viable alternatives were not available, the mitigation plan was adequate, procedural requirements were met and other agencies and experts were consulted. *State of Missouri v. Department of the Army, Corps of Engineers, supra*, 526 F.Supp. at 674–77.

After a careful review of the environmental impact statements, we are satisfied that the district court did not err in its finding that the statements complied with all pertinent environmental statutes.

## C. The Fish and Wildlife Coordination Act

■ The district court recognized that the provisions of FWCA, 16 U.S.C. § 661, *et seq.* (1976), required that the Corps, in proposing to modify the waters of any stream, must consult with the United States Fish and Wildlife Service, Department of Interior, and give full consideration to reports by concerned federal and state agencies on the wildlife aspects of the project. The court noted, *inter alia*, that "[d]efendants are making an effort to minimize adverse effects of the operation of the Stockton project upon fish and wildlife." *State of Missouri v. Department of the Army, Corps of Engineers, supra*, 526 F.Supp. at 677 n.7. The FEIS indicates the district engineer considered the effects of the program on fish and wildlife populations and habitat. Some sixteen paragraphs were devoted to the subject. Several paragraphs were also devoted to this subject in the FSEIS.

## D. Water Pollution Laws

Appellants argue that the district court erred in finding that the Corps of Engineers did not violate the FWPCA (Federal Water Pollution Control Act), 33 U.S.C. § 1251 *et seq.* because the project is generating pollution under the definition of pollution provided in the Act.[5] Appellants contend this pollution is generated by the erosion of soil caused by fluctuations in the flowage of water from the power plant and from the reduction of oxygen as a result of water turbulence at the dam.

Appellant state of Missouri contends that the district court erred in finding the project did not fall under the definition of "discharge" or "runoff." "Discharge of a pollutant" is defined under the FWPCA as "any addition of any pollutant to navigable waters from any point source * * *." 33 U.S.C. § 1362(12). "Point source" is

5. The FWPCA provides, in pertinent part, that each federal agency:
    (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, * * * shall be subject to, and comply with, all Federal, State, interstate, and local [water quality laws] * * *. 33 U.S.C. § 1323(a).

defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit * * * from which pollutants are or may be discharged * * *." *Id.* at § 1362(14).

■ The district court held that the operation of the dam did not result in the "discharge of a pollutant" as that term is defined by the FWPCA because the discharge of a pollutant requires an "addition" of a pollutant from a "point source" and neither term applied to soil erosion or the oxygen content of the water.

We hold that the district court did not err in finding that the alleged soil erosion caused below the dam or the reduction of oxygen caused by the dam did not constitute the "addition" of a pollutant from a "point source."

■ Appellants point out that the FWPCA also applies to "runoff" and they argue that this term should apply to soil erosion. The act does not define "runoff." The district court held that "the term 'runoff' ordinarily refers to the flow of excess precipitation (such as rain or snow) into a stream." It concluded that the rise and fall of the water level in the river because of fluctuations in the discharge of the dammed stream could not be classified as runoff of a pollutant within the meaning of the FWPCA. Appellants have failed to convince us that the district court's definition of runoff or its application of the definition is erroneous.

■ Appellant landowners argue that the FWPCA subjects the Corps of Engineers to the MCWL (Missouri Clean Water Law), Mo.Rev.Stat. § 204.006–.141. The landowners argue that under section 204.-051 the Corps of Engineers is polluting the Sac River through the erosion of soil caused by the fluctuations in the level of the river.

The district court held that the FWPCA subjects the Corps of Engineers to state water quality laws only if it were causing "the discharge or runoff of pollutants." The district court concluded the MCWL did not apply because soil erosion and the re-duction of oxygen did not constitute a "discharge" or "runoff" of pollutants.

We cannot say that the district court erred in finding the MCWL did not apply.

### E. Nuisance

■ Appellant state of Missouri argues that the district court erred in holding that the operation of the dam did not constitute a public nuisance. This issue was actively pursued before the district court by appellant landowners and was included in the state's contentions only through amendment to its pleadings.

The district court held that under Missouri law a nuisance is defined as a "wrong arising from an *unreasonable or unlawful* use of property to the discomfort, annoyance, inconvenience or damage of another, and usually comprehends continuous or recurrent acts." *State of Missouri v. Department of the Army, Corps of Engineers, supra,* 526 F.Supp. at 678 (quoting *Meinecke v. Stallsworth,* 483 S.W.2d 633, 637 (Mo. App.1972) (emphasis added)).

The district court found that the operation of the dam did not constitute a nuisance because it was authorized by law, the Corps of Engineers' conduct was reasonable, and the harms suffered by the public from nonoperation of the hydroelectric dam outweigh the harm suffered by appellants from its operation.

As we have already held, the district court was correct in finding the dam's proposed operation to be within the congressional authorization and that its actions were reasonable. Furthermore, the district court's balancing of the relative harms that would be suffered by each side was well-reasoned. We affirm its dismissal of the nuisance claim.

### IV. CONCLUSION

We affirm the district court on all counts on the basis of its well-reasoned and thorough opinion.

Affirmed.