579 F.Supp. 1273 (1984)
In re OHIO RIVER DISASTER LITIGATION.
In the Matter of MIDLAND ENTERPRISES, INC.
In the Matter of WALKER TOWING CORPORATION.
UNION MECHLING CORP.
v.
UNITED STATES.
UNITED STATES
v.
MIDLAND ENTERPRISES, INC.
UNITED STATES
v.
WALKER TOWING CORPORATION.
UNITED STATES
v.
HOUSTON BARGE LINE, INC. WALCOTT
v.
UNITED STATES.
Nos. C-1-78-075, C-1-79-208, C-1-80-028, C-1-80-591, C-1-80-592, C-1-81-414 and C-1-79-002.
United States District Court, S.D. Ohio, W.D.
January 5, 1984.

*1274 MEMORANDUM AND ORDER
SPIEGEL, District Judge.
These consolidated cases are before the Court on the motion of the United States for partial summary judgment (doc. 173), the response of Walker Towing (doc. 213 in C-1-79-208), the response of Houston Barge Line and Wells Fargo Leasing (doc. 30 in C-1-81-414); the response of Midland Enterprises, Orgulf Transportation and the Ohio River Company (doc. 73); the response of Union Mechling Corp. (docs. 25 and 26 in C-1-80-028), the response of Indiana & Michigan Electric Corp. (doc. 22 *1275 in C-1-80-591) and the government's reply (doc. 173). A lengthy hearing was held on the motion on December 20, 1983, and the motion is ripe for decision.

I. Introduction

This case arises from the January, 1978 freezing over of the Ohio River, which resulted in massive damages to both the government and the private parties to these actions. The motion at bar raises, for the second time in this lengthy litigation, the question of whether certain actions by representatives of the Army Corps of Engineers which allegedly contributed to or caused the damages sustained by the private parties, as well as much of the damage sustained by the Government, are insulated from suit by sovereign immunity. The issues are whether the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a), should be read into the Suits in Admiralty Act, 46 U.S.C. §§ 741-52; and, if so, whether various governmental activities are "discretionary" under the law and on the facts as thoroughly developed through discovery.
We conclude that the discretionary function exception must be considered as applicable to the Suits in Admiralty Act. We further conclude that the government's motion must be granted as to the claims against it for the geographical placement and overall design of the Markland Lock and Dam, which is the focal point of this litigation. However, the motion must be denied as to the modification of the dam to incapacitate a number of submergible tainter gates, designed so that ice and water could be washed over the gate instead of through the lock or under the gates. It must also be denied as to the formulation of the daily plan of operations for the dam; and the formulation of an "ice plan" to guide the lockmaster in coping with emergency winter weather situations.

A. Facts

In part, our reluctance to grant the government's motion as to the last three points of its motion is based upon the impossibility, at this stage of the case, of arriving at an accurate and comprehensive statement of the facts surrounding the events giving rise to suit. However, we are able to provide a skeletal framework of events.
The Markland Lock and Dam was constructed in the late 1950s. It was the culmination of feasibility studies dating back as far as 1933, and siting studies had commenced in 1952. The Corps decided that the dam would be placed on the same site as an outmoded dam. The site is in some ways not an optimum one, as it is built on the downstream side of a sweeping bend in the river. Because such bends are natural points of accumulation for ice moving downstream, the effect of the dam placement is that any ice which comes downstream slows at the bend and, if weather conditions are severe, may refreeze. Similarly, the slowdown makes it more difficult to utilize conventional methods of passing ice through the dam. However, it appears that a critical factor to be taken into account in the engineering of a lock and dam is the condition of the river bottom at the site. The primary concern in that regard is the selection of a site where the bottom is hard enough to avoid significant scouring, or erosion of the river bed caused by the turbulence generated by passing hugh volumes of water through a dam. In this regard, the site chosen by the Corps was a good one; thus, the decision was made that the advantages of the site overcame the problems, of which the Corps was then aware, caused by the bend in the river.
The Markland Dam was the first of several "high lift" dams built on the Ohio and other rivers. A high lift dam is one able, by virtue of its capacity to raise or lower vessels a greater vertical distance than older dams, to replace a number of "low lift" dams, thereby speeding up navigation.
The dam was constructed with a number of submergible tainter gates. To our understanding, Markland was the first dam to include such gates, which are designed so that they can either be lifted up so that water and debris can pass underneath them, or lowered beneath the water surface *1276 so that water and ice flow over. Previous dams had gates which could only be raised, and it was difficult, if not impossible, to pass ice through such gates because to do so, they had to be raised so high that the river level would be drastically lowered. Thus, the submergible gates were not only a technological improvement, but were designed to significantly ameliorate the effect of placing the dam below a curve, by making it much easier to handle ice emergencies.
As noted, the submergible gates were a new idea. While they were extensively tested prior to installation, the Corps had no practical experience with them prior to their installation at Markland. During discovery, the private parties learned that an engineer on assignment to Markland during its construction became concerned with the possibility that a serious vibration problem might occur when the submergible gates were operated. He tested the first such gate to become operational, and found that such a problem indeed existed. Nonetheless, the Corps proceeded to construct the dam as planned.
After the dam was built, it became apparent that vibration was a serious problem. Concerned for the integrity of the dam, the Corps determined that the submergible gates should be used as sparingly as possible. However, in 1976, a large shaft which operated one of the submergible gates broke. It was determined that the break was caused by metal fatigue, which had in turn been caused by the vibration attendant to use of the submergible gates. Because of the severity of the problem, the regional office of the Corps decided to render the gates nonsubmergible by installing gate stops. According to the affidavit of John Speaker, the Chief of the Design Branch, Engineering Division, of the Corps, there is a program currently underway which will render the gates permanently nonsubmergible by installing concrete sills under them. Speaker also notes that
The decisions and plans of action with respect to the submergible gates were products of a great deal of professional engineering expertise. The benefits from submerging a gate did not outweigh the danger to the structure, in the opinion of [the Corps].
Speaker Affidavit at ¶ 10.
In January of 1978, in what is generally acknowledged to have been the most severe winter in this area in years, disaster struck. We are not, at this point, in a position to reach intelligent conclusions as to precisely what occurred; indeed, a full week of trial time is set aside in early 1984 solely to determine the chain of events leading up to the damages claimed by the parties. However, for purposes of resolving the motion before us, it is sufficient to note the following. After a period of above-freezing temperatures and torrential rains, the temperature dropped drastically. The river, though swollen, began to freeze. As ice formed, the locking operations became more difficult and slower, and a number of tugs with tows were forced to stack up in the Markland pool just above the dam, waiting their turn in the lock. On January 27th, the ice began moving downstream, and a number of barges broke loose from their makeshift moorings by the sheer mass of the ice. Several tugs and tows ended up fast against the dam, and some barges sunk.
In these actions, the government claims for damages to the dam under the Rivers and Harbors Act, 33 U.S.C. 577 et seq. and for reimbursement for costs expended in salvage operations necessary to reopen the Ohio to commerce. The private parties claim against the government for negligently placing the dam below a bend, for failing to install a special mechanism for washing ice downstream, for negligently building the submergible gates and for creating a dangerous situation by incapacitating them, and for responding in a generally negligent fashion to the emergency conditions created by the movement of ice. By its motion, the government seeks to have the discretionary function exception engrafted onto the SIAA, and to have the following things determined to be discretionary functions, thus relieving the Court *1277 of jurisdiction to consider the propriety of its actions pertaining to:
The design and placement of the dam;
The decision not to include a means for washing ice and debris through the dam;
The decision to incapacitate the submergible gates;
The formulation of a plan of daily operations for the dam;
The formulation of an "ice plan" for dealing with freezing conditions.
The private parties responded to the government's claims with vigor, arguing that only the actual decision to build the dam was truly discretionary, and that the Court is able, based upon engineering standards, to determine the question of the adequacy of the site and other decisions pertaining to the design and construction of the dam. The points raised by the papers are considered seriatim in the pages which follow.

B. Summary Judgment

Under Rule 56, Fed.R.Civ.P., summary judgment
shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
In considering the government's motion, we consider the materials listed in the Rule in the light most favorable to the private parties, and the burden is on the government to demonstrate its entitlement to summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Felix v. Young, 536 F.2d 1126 (6th Cir.1976). Although the filings pertaining to this case are extraordinarily voluminous, we have attempted to review as much of the relevant material on file as possible, including the affidavits filed by the government, several depositions, and the parties' submissions.

II. Discretionary Function Arising under the SIAA.

A threshold question is presented by the issue of whether or not the discretionary function exception to the Federal Tort Claims Act should be engrafted on to the Suits in Admiralty Act.
The discretionary function exception provides that the provisions of the Tort Claims Act which provide that the United States "shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, nonetheless
shall not apply to
(a) any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
28 U.S.C. § 2680(a).
The issue is one which has divided the appellate courts. The issue has been considered directly by at least five circuits. The two earlier decisions held that, because Congress had declined to incorporate the terms of the exception into the SIAA when it was amended in 1960, the courts must not incorporate what Congress had, presumably intentionally, left out. Lane v. United States, 529 F.2d 175 (4th Cir.1975); De Bardeleban Marine Corp. v. United States, 451 F.2d 140 (5th Cir.1971) (dictum).
The three more recent cases dealing with the issue, however, concluded that the exception should be read into the SIAA, and that claims based upon acts or omissions which were discretionary were outside the jurisdiction of the district courts. Canadian Transport Company v. United States, 663 F.2d 1081 (D.C.Cir.1980); Bearce v. United States, 614 F.2d 556 (7th Cir.), cert. denied, 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); Gercey v. United States, 540 F.2d 536 (1st Cir.1976), cert. denied, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). As the issue was framed by the Seventh Circuit:

*1278 The Suits in Admiralty Act (SIAA) was originally enacted in 1920 as a waiver of sovereign immunity in cases arising out of claims involving United States vessels and cargo. In 1960 the statute was amended to eliminate a variety of jurisdictional problems by bringing all maritime claims against the United States under the admiralty jurisdiction of the federal courts. [citation.] One of the results of the 1960 amendment was to remove maritime claims such as the ones at bar from the coverage of the Federal Tort Claims Act (FTCA). However, when the SIAA was amended, the exceptions ... were not restated .... Thus, if the exceptions expressed in 28 U.S.C. § 2680 are not implied in suits under the SIAA, the 1960 amendments to the SIAA will have served not only to eliminate jurisdictional difficulties but also to extend the waiver of sovereign immunity in the area of maritime law.
Bearce, 614 F.2d at 559 (footnote omitted). We note that the Bearce and Gercey panels were persuaded in their holdings that the exception was read into the SIAA by the case of United States v. United Continental Tuna Corp., 425 U.S. 164, 176, 96 S.Ct. 1319, 1326, 47 L.Ed.2d 653 (1976), "where the Court noted that the 1960 amendments to the SIAA were intended to eliminate jurisdictional problems." Bearce, 614 F.2d at 559-60.
In Canadian Transport, the Coast Guard denied a foreign freighter permission to enter the port of Norfolk because "the master and officers of TROPWAVE were Polish nationals whose presence posed a risk to national security." Id. at 1083. Suit was brought under the SIAA for interference with contract rights, and the discretionary function defense was interposed. The court concluded that
respect for the doctrine of separation of powers requires that in cases arising under the [SIAA], courts should refrain from passing judgment on the appropriateness of actions of the executive branch which meet the requirements of the discretionary function exception of the FTCA. Accordingly, we align ourselves with the views expressed in the Gercey case and hold that a discretionary function exception is implicit in the Suits in Admiralty Act.
Id. at 1085. The court further noted that the incorporation of the exception into the SIAA was "not an attempt to rewrite the statute, but merely an acknowledgement of the limits of judicial power." Id. at 1086.
In 1982, the Sixth Circuit decided Gemp v. United States, 684 F.2d 404 (6th Cir. 1982). The issue before the court was whether or not the Corps of Engineers had a duty to warn boaters of the open and obvious hazard created by turbulent conditions immediately below a dam on the Ohio River. After concluding that there was not such a duty, the court turned to the issue of whether the Corps was under a statutory duty to warn boaters of the hazard into which plaintiffs or their decedents had fallen. The court wrote that
[t]he area below the Meldahl Dam was not posted by the District Engineers. Defendant claims that this was discretionary with the District Engineers. Although once an area around a dam has been designated as a restricted area, warnings must be posted, we hold that the initial decision whether to post is discretionary with the District Engineers and is not subject to review under the Suits in Admiralty Act. See Bearce ...; Gercey ....
Id. at 408. The United States argues that Gemp squarely holds that the discretionary function is incorporated into the SIAA. The private parties respond that this is not the case, since, they claim, the passage was dictum. We cannot agree. While it appears to be true that the passage was unnecessary to the primary holding of the casethat no warning is necessary where a maritime hazard is open and notoriousit was still essential to disposition of the claim that a statutory duty had been violated. Moreover, even were that not the case, the court specifically held that discretionary decisions are not reviewable under the SIAA. It would surely be improvident for this Court to hold otherwise in light of a statement of such clarity. Furthermore, *1279 even were we to conclude that the Sixth Circuit has not bound this Court on the issue, we are unwilling to ignore the scholarship and reasoning of Gercey, Bearce and Canadian Transport and would on the basis of those cases, apply the terms of § 2680(a) to the case at bar.
In so holding, we are conscious that there are reasons to use a light touch in determining whether particular actions by government employees were discretionary. It is clear that
Congress did not intend the judiciary to `second guess' policy decisions, or to block or hamper beneficial governmental programs, through tort suits even though injury or damage may result from wrongful or negligent decisions or from the carrying out of a program.
2 L.S. Jayson, Handling Federal Tort Claims § 249.06[1] (noting too, that "[a]pplication of the discretionary function exception to this type of situation perpetuates the inequities and harshness of the doctrine of sovereign immunity," id.). However, the decisions with which we are concerned here are, perhaps more than most governmental decisions, ones which can be reviewed in light of evidence delineating engineering standards, just as is true of a like controversy between private parties. Because of this concern, we are impressed with the position adopted by the court in Canadian Transport.
We think ... that the result in this case should not turn on whether the Coast Guard's actions can be labelled as "planning" or "operational." Although that distinction provides a useful guideline, a proper decision can be reached only by keeping the purposes of the discretionary function exemption in mind.... Decisions which require a government official to weigh competing policy alternatives are entitled to immunity for such decisions are the ordinary responsibility of the legislative and executive branches. [citations.] Conversely, if the decision involves only the implementation of policy choices already made, there is usually no reason for a court to refrain from passing judgment ....
663 F.2d at 1087. While we are not entirely sure that the distinction is one with a difference, it appears to be more constructive in this instance to consider the nature of the decisions in question as being policy decisions or implementation decisions, than to consider only whether they were operational or otherwise.

A. Law of the Case

This is not the first time the issue of incorporation of the discretionary function exception into the SIAA has arisen in this litigation. The case was, for some years, consolidated with cases from other districts under the aegis of the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407. The MDL portion of the litigation was handled by another member of this Court, who was faced with a similar motion filed by the United States. Concluding that "this is really an issue deserving of appellate consideration" at a time when the Sixth Circuit had been wholly silent on the point, the Court determined that the motion was not well taken, and denied it (doc. 162 in C-1-79-208). Thus, the doctrine of the "law of the case" is implicated here.
We have, however, found no authority for the proposition that an intervening change in the law of the circuit in which a district court sits does not mandate the adjustment of previous holdings, where those holdings are in clear disagreement with intervening higher authority. "The law of the case gives way to the law of the land," the maxim goes, and for our purposes the "law of the Circuit" is equally significant. We therefore do not consider the Court bound by the prior determination.

III. The Discretionary Function Exception.

Having concluded that Gemp must control our resolution of the applicability of the discretionary function exception in this case, we are inclined to agree with Walker that "an equally difficult and perhaps harder question remains as to the definition and application of the term `discretionary function.'" *1280 Doc. 213 in C-1-78-208 at 3. The United States contends that the issue is a simple one; it argues that we need only consider whether the allegations of Walker address the actions of line-level employees. It asserts that any actions taken by government employees at a level above the actual physical operation of the lock and dam are, by definition, discretionary, because they involve planning functions as opposed to the execution of plans generated by higher-ups. Unfortunately, this argument is somewhat disingenuous. While it would be convenient were the matter so simple, our review of the cases suggests that it is not.
The starting point in any discretionary function analysis is Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The Court held that the government could not be held liable for having negligently formulated a methodology for transporting fertilizer-grade ammonium nitrate to occupied countries following World War II. The negligent acts found by the district court included negligent drafting of a plan drafted by the Field Director of Ammunition Plants, the negligence having included arguably inappropriate packaging temperatures and insufficient warning labels. Additionally, plaintiff claimed that the government had been negligent in its attempts to fight the fires which resulted from the stowage of the ammonium nitrate in ship holds.
The Court concluded that "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." Id. at 42, 73 S.Ct. at 971. In a frequently quoted passage, the Court stated that
It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the `discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.
Id. at 35-36, 73 S.Ct. at 967-68 (footnote omitted).
Dalehite, read broadly, provides substantial support for the government's claims here. As noted by a leading commentator, "[d]espite comments to the contrary by some lower courts [and by claimant in this case], it seems safe to say that there has been no Tort Claims Act decision by the Supreme Court ... which has significantly modified these views as to the nature or scope of the discretionary function exception." L.S. Jayson, Handling Federal Tort Claims § 249.03 (1983). However, tempting as it is to reason that any directive which comes from managerial employees at whatever level constitutes "policy judgment and decision," the cases following Dalehite demonstrate that a more finely tuned analysis is appropriate, and that the planning/operation distinction is not the only relevant inquiry.
In Indian Towing Co., Inc. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Court was faced with the question of whether, once the government has exercised its discretion and determined that a public works project should be erected, it may then fail to faithfully maintain it. A lighthouse had been erected, but was permitted to fall into disrepair, and no warning was given to navigators, that it was not in proper order. Relying on the charts, plaintiff's vessel ran aground because the lighthouse was out of commission. The Court held that while the erection of a lighthouse was a "uniquely governmental function" and the decision to build it was discretionary, once it was built, *1281 a duty arose to either maintain it properly or warn of its incapacity. Walker contends that Indian Towing constituted a retrenchment from Dalehite. While we do not wholly agree with that argument, the case nonetheless has some relevance to the facts at bar. (See infra at pp. 1282-1284.)
Dalehite and Indian Towing provide a sturdy, though far from comprehensive, framework for our analysis of the government's motion. From our review of a number of cases dealing with the exception, we have fleshed out a method of approaching the issues raised. A number of factors appear to be significant, including the following. The "planning/operation" distinction attributed to Dalehite is of continuing vitality. However, in this Circuit, "the basic question concerning the exception is whether the judgments ... are of `the nature and quality' which Congress intended to put beyond judicial review". Downs v. United States, 522 F.2d 990 (6th Cir.1975). In determining that issue, we will examine the extent to which the claim is one which can be evaluated in terms of fixed standards of engineering or technical expertisei.e., whether it is the sort of case which the courts are accustomed to evaluating. Driscoll v. United States, 525 F.2d 136 (9th Cir.1975); Griffin v. United States, 500 F.2d 1059 (3d Cir.1974); United States v. DeCamp, 478 F.2d 1188 (9th Cir.), cert. denied, 414 U.S. 924, 94 S.Ct. 232, 38 L.Ed.2d 158 (1973); Hendry v. United States, 418 F.2d 774 (2d Cir.1969). We will also examine the extent to which the decision, whether or not it establishes a "plan," constitutes an implementation of policy rather than its creation. Downs, 522 F.2d at 997; Miller v. United States, 583 F.2d 857 (6th Cir.1978) (discretion means "that an official has the `power of free decision' and is not bound by tort standards set by another authority such as a court," 583 F.2d at 866).
This analytical framework is in keeping with that developed by the Hendry court, 418 F.2d at 781-83. See also Pigott v. United States, 451 F.2d 574, 575 (5th Cir. 1971). It also seeks to balance the approach urged by the government, which would result in the emasculation of the SIAA, see Smith v. United States, 375 F.2d 243 (5th Cir.1967), cert. denied, 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1968), with that of the private parties, which would open to suit all decisions below the Congressional level.

IV. The Government's Motion.

We now turn to the application of these principles to the motion at bar.

A. The Placement and Design of the Dam.

The first two decisions the United States wishes to have determined to be immune from suit are where to place the dam and not to incorporate an ice and drift chute in the final design. The government suggests that such decisions are paradigms of dicretionary functions. We agree. The decision where to place the dam is one which involved balancing of numerous factors including, among others, the prospects for serious damage to the river bed at other locations and the need for a water supply for a power plant on the Indiana shore. The clarity of hindsight might indicate that the balance was poorly struck. However, in light of the wealth of authority for the proposition that the government cannot be liable for damages allegedly resulting from the method in which its agencies implement public works projects mandated by Congress, the private parties have the laboring oar in their effort to persuade us that it would be proper for us to review those claims. See, e.g., Missouri ex rel. Ashcroft v. Department of the Army, 672 F.2d 1297, 1301 (8th Cir.1982) (location of dam is discretionary); United States v. 2,606.84 Acres, 432 F.2d 1286 (5th Cir.1970) (decision on how much land should be condemned for reservoir project was discretionary); United States v. Ure, 225 F.2d 709 (9th Cir.1955) (decision on the extent to which a canal should be lined with concrete held to be discretionary). Dalehite dictated that what is protected is "the discretion of the executive or the administrator to act according to one's judgment of the best course," 346 U.S. at 34, 73 S.Ct. at 967. *1282 Here, the highest echelon of Corps engineers and decision-makers determined that the dam should be built where it was in the exercise of their "judgment of the best course," and we are not in a position to assail that judgment.
The same logic applies to the incorporation of an ice and drift chute in the design of the dam. The government agrees that such a chute might have prevented some of the damages sustained by the private parties. However, the private parties concede that the decision not to include the chute, which was fully tested by the Corps, was at least in part based upon a determination that inclusion of the chute would have created a significant problem with turbulence on the upstream side of the dam, creating navigational hazards for small craft. Again, the decision was one which was the product of research, engineering expertise and a balancing of competing and opposing factors.
The private parties attempt to overcome the persuasive tenor of the government's motion as to these two claims by asserting that the decisions where to put a dam and how to build it "simply have nothing to do with the stuff of government" (doc. 25 in C-1-80-028 at 12) (emphasis omitted). That contention overlooks a wealth of authority for the proposition advanced by the government. While dam placement is certainly not a decision which carries the imprimatur of Congress or the President, it is nonetheless one which, if subject to review, would greatly hamper the Corps in carrying out its duties with regard to commerce.
More persuasively, the towing companies and others argue that while the decisions where and how to build the dam may at first blush seem discretionary, they must be considered in the context of the history of the previous dam at the same location, the knowledge of the Corps regarding ice hazards downstream from bends, and problems inherent with submergible tainter gates. However, we have found no authority for the idea that a discretionary decision may be subject to review under any circumstances; nor are we prepared to so rule. Therefore, we grant the government's motion with regard to the design of the dam and the failure to include an ice and drift chute.

B. The Decision to Incapacitate the Submergible Gates.

The government next seeks to have the decision to render the submergible tainter gates inoperable declared discretionary and hence outside the scope of our review of the Corps' actions in this case. It argues that there was little difference between that decision and the ones just discussed, and that the Corps should be just as free to effect modifications to its projects which experience shows to be necessary as it is free to plan and place them in the first instance. It further argues that the decision to incapacitate the gates was simply "a revision in the plan of operation," and that because it would be difficult to reincorporate the submergible gates into the dam, "[a]n undertaking of this type and magnitude is, of course, discretionary." (Doc. 173 at 19).
We must, on the government's motion for summary judgment, construe the facts in the light most favorable to the private parties. Applying this standard to the Corps' decision to cripple the gates, we find that there are unresolved questions of material fact which preclude summary judgment as to that decision.
It appears to be uncontested that the Corps knew, when it determined where the Markland Dam would be placed, that putting it just below a bend in the river gave rise to an enhanced probability that problems could arise in severe ice conditions. That being so, the submergible tainter gates represented an attempt to ameliorate that problem, making the placement a practical one in view of all the circumstances. As we have already determined, that decision is protected by the discretionary function exception. Construing the evidence favorably to the private parties, the government thus assumed a duty to utilize its engineering expertise to overcome the potential hazards posed by the location of the dam to those using the river by providing *1283 an alternate means of washing ice. Moreover, the submergible gates were, the Corps determined, a better alternative than including an ice and drift chute in the original design of the dama decision which we have also determined to be excepted from suit.
Once that decision was made, however, we think that the government's subsequent conduct with regard to the dam must be viewed in the context of its awareness of the potential for disaster reflected in the decision itself. The case is therefore one which appears for present purposes to be within the purview of Indian Towing, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. The decisions pertaining to the original design of the dam were discretionary; decisions pertaining to its operation must be more closely scrutinized. We do not read Indian Towing to insulate only failure to maintain public projects at the lowest level of responsibility. Here, the gates were built with the knowledge that there was a good possibility that vibration would be a problem: and when the problem surfaced, the solution chosen by the Corps was to incapacitate the submergible feature of the gatesthe only mechanism incorporated into the design to cope with ice. Had the Coast Guard in Indian Towing simply decided that it was expedient not to service the lighthouse, the decision would have been as negligent as was the failure to do so by "operational" employees; it would be only upon an overly strict view of the importance of the level of the decision-maker that such negligence would not have been actionable. Here, the decision was, we are told, the product "of a great deal of engineering expertise." Speaker Affidavit at ¶ 10. It may be that the evidence will show the decision to have been the right one in view of sound engineering principles. However, in light of the Corps' knowledge of the potential for ice problems, and in view of Indian Towing, we are unwilling to hold that a decision which so drastically altered the safety of a public works project is within the discretionary function exception. The decision is not one which is clearly "of `the nature and quality' which Congress intended to put beyond judicial review." Downs, 522 F.2d at 997. Moreover, because it was, as Mr. Speaker's affidavit demonstrates, an engineering decision, it is of a sort which we are accustomed to reviewing on the merits. Finally, while the decision was a matter of judgment, "[j]udgment is exercised in almost every human endeavor," id. at 995; the decision implemented the Corps' mandate to maintain the dam, and the private parties should have made the opportunity to demonstrate that it was negligently made.
We hold that, for purposes of resolving the instant motion, the decision to cripple the submergible feature of the gates was not clearly discretionary.

C. The "Operating" and "Ice" Plans

The United States contends that because formulation of "plans of operation" is regularly found to be within the terms of the exception, the plans passed down from the Louisville Office of the Corps to the Lockmaster at Markland are, as a matter of law, exempt from review. They argue that Dalehite, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427; Miller, 583 F.2d 857; Reminga v. United States, 631 F.2d 449 (6th Cir. 1980) and a number of other cases provide guideposts for the Court which lead inescapably to the conclusion that the formulation of the plans was discretionary, and that the issue is properly disposed of by summary judgment.
We disagree. Again, the plan was the result of engineering decisions made by Corps personnel. As noted in the affidavit of the Chief of the Waterways Management Branch, Operations Division of the Louisville District, the plan "is not a formal regulation like those issued by the Office, Chief of Engineers and the Louisville District Commander." Dickson Affidavit at ¶ 8. The plan certainly includes the weighing of such factors as how to best prevent scour and how to best protect vessels: it may well be that the plan was in fact appropriate given all the factors. However, the private parties allege that the plan was negligently drawn  that it was, in effect, a "non-plan" which failed to provide *1284 for important and obvious steps in the event of an emergency ice condition. The drafting of a daily operations plan is a "policy" matter in the broad sense of the word. However, we are not able to say, at this juncture, that those who drafted the plan had "the `power of free decision'" so as not to be "bound by tort standards." Miller, 583 F.2d at 866. This is especially true where, according to the private parties, the plan was formulated without taking into consideration the peculiarities of the situation at Markland. We do not, of course, say that the plan was insufficient; we only hold that the private parties should have the opportunity to present their evidence on the point. In essence, they propose to prove that the plan, as drafted, permitted the operators of the dam to sit by and watch a crisis develop without acting to avert it.[1] The government would have us hold that because their alleged inaction was authorized or mandated by the plan, then it is exempt from suit. We do not read the discretionary function exception as permitting the government to skirt liability in such a fashion, just as we do not read Dalehite to mandate that, if a middle manager in the Coast Guard in Indian Towing had decreed, for economic reasons, that the lighthouse not be maintained, liability would not attach. Rather, we think that once the government undertook to operate the Markland Dam, it was bound to do so in a fashion dictated by considerations of engineering and managerial prudence.

V. Conclusion

Based upon the foregoing, the government's motion is granted as to the design of the Markland Dam and the failure to incorporate an ice and drift chute into its design. It is denied as to the other issues raised.
The issues raised are, by virtue of the nature of the discretionary function animal, difficult ones. The case, too, is extremely complex. The denial of portions of the motion is, therefore, without prejudice to its renewal at an appropriate time as this litigation proceeds. We note, too, that the private parties have a heavy burden in seeking to persuade the Court that the government should be held liable for determining that the decisions and actions of Corps employees were negligent and that they are entitled to recover as a result. However, the issues upon which summary judgment is denied are ones which we do not view as having been fully developed, and our questions as to the character and appropriateness of those decisions leads us to conclude that the motion is not well taken as to them.

ORDER
The motion of the United States for partial summary judgment is granted on the issue of the design and placement of the Markland Dam and denied without prejudice in all other regards.
SO ORDERED.
NOTES
[1] The shippers also allege that the problems at Markland were critically compounded by a deviation from the "ice plan" by the lockmaster at the Meldahl Dam, which is the first dam upstream from Markland, who apparently took an active role in managing the situation as it developed at his facility. It appears undisputed that the alleged deviation at Meldahl averted crisis there. However, the private parties argue that the plan was deficient in that it did not provide for such exigencies, and that the Markland lockmaster's adherence to it was thus negligent.