STARKE COUNTY FARM BUREAU CO-OPERATIVE ASSOCIATION, INC., and Allen County Cooperative, Inc., Plaintiffs,

v.

INTERSTATE COMMERCE COMMISSION, and Council on Environmental Quality, Defendants.

Civ. No. 1:93cv233.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 9, 1993.

*Kincheloe v. Farmer,* 214 F.2d 604, 605 (7th Cir.1954).

Frank J. Gray, Douglas E. Miller, Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, Fritz R. Kahn, Kevin B. McCarthy, Indianapolis, IN, for plaintiffs.

David H. Miller, U.S. Attys. Office, Fort Wayne, IN, Anthony P. Hoang, U.S. Dept. of Justice, Environment and Natural Resources

Div., General Litigation Section, Washington, DC, Evelyn G. Kitay, Interstate Commerce Com'n, Office of the General Counsel, Washington, DC, for defendants.

J. Michael O'Hara, Anthony M. Stites, Barrett and McNagny, Fort Wayne, IN, John J. Paylor, Jonathan M. Broder, Philadelphia, PA, for intervenor defendant.

Douglas E. Miller, Beckman Lawson Sandler Snyder and Federoff, Fort Wayne, IN, J. Timothy McCaulay, Fort Wayne, IN, Kevin B. McCarthy, Indianapolis, IN, for intervenor.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendants' motion to dismiss plaintiffs' first amended complaint and on defendants' motion to strike affidavits. The defendants also oppose the plaintiffs' motion for leave to file a second amended complaint. Further, the City of Fort Wayne, a class action plaintiff in a subsequent case filed in this court[1] against the Interstate Commerce Commission and the Council on Environmental Quality has filed a motion to intervene or, in the alternative, to consolidate. Briefing was completed on all issues on November 16, 1993.

### Discussion

On September 10, 1993, the Starke County Farm Bureau Cooperative Association, Inc.[2] ("Starke County Co-op") and the Allen County Cooperative, Inc.[3] ("Allen County Co-op") filed their first amended complaint for injunctive relief in the nature of mandamus against the Interstate Commerce Commission ("ICC") and the Council on Environmental Quality ("CEQ")[4].

The plaintiffs' complaint alleges that the ICC has administered and applied 49 U.S.C. §§ 10903–10907[5] to the abandonment of various sub-segments of the *Fort Wayne Line*[6] between Crestline, Ohio on the east, and Gary, Indiana on the west. The plaintiffs claim that the CEQ has approved illegal procedures or regulations of the ICC under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

The plaintiffs further allege that the improper piecemealing and sub-segmentation of the *Fort Wayne Line* will destroy the ability of the plaintiffs to ship rail freight to and

---

1. Civil No. 1:93cv282.

2. The Starke County Co-op is an agricultural cooperative which owns and operates a large grain warehouse, fertilizer, and farm service facility, and has its principal office at Hamlet, Starke County, Indiana. First Amended Complaint at ¶ 2.

3. The Allen County Co-op is an agricultural cooperative which owns and operates a large grain warehouse and other facilities at Arcola, Indiana and has its principal office at New Haven in Allen County, Indiana. First Amended Complaint at ¶ 2.

4. Title II of NEPA, 42 U.S.C. §§ 4341–4347, establishes the CEQ and details its duties and functions. Generally, the CEQ performs an Executive Office oversight function. As set forth in 42 U.S.C. § 4344(3), the CEQ is "to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy...."

To accomplish this directive, the CEQ promulgated the regulations codified at 40 C.F.R. 1500–1508 to implement the procedural provisions of NEPA and to provide all federal agencies with efficient and uniform procedures for translating NEPA into practical action. 40 C.F.R. § 1500.1–1500.6.

As part of its oversight responsibility, the CEQ consults with all federal agencies regarding their adoption and promulgation of environmental rules and procedures to implement NEPA. 40 C.F.R. 1505.1. Additionally, in certain situations, such as when federal agencies disagree on a proposed action that may cause unsatisfactory environmental results or when emergency circumstances arise which may alter agency options and have significant environmental impact, CEQ consults with the involved agencies as part of the decisionmaking process. *See* 40 C.F.R. §§ 1504, 1506.11.

5. 49 U.S.C. §§ 10903–10907 detail the ICC's authority, duties, and procedures with respect to authorizing the abandonment or discontinuance of railroad lines and rail transportation.

6. For purposes of this order, unless otherwise indicated, the *"Fort Wayne Line"* means that former Pennsylvania Railroad line owned and operated by the Consolidated Rail Corporation between Alliance, Ohio on the east, and Chicago, Illinois on the west, via Crestline and Lima, Ohio and Fort Wayne and Hamlet, Indiana.

through Fort Wayne, Indiana. Plaintiffs also assert that they have presented "environmental claims" to the ICC, which responded with a decision, and thus the plaintiffs believe they have exhausted their administrative remedies. The plaintiffs "environmental claims" essentially consist of an assertion that the ICC has processed the abandonment application without a legally sufficient environmental staff.

In their prayer for relief, the plaintiffs request this court to issue an order enjoining the ICC and the CEQ from any further action on the abandonment of the *Fort Wayne Line* unless and until: (1) The ICC has employed proper environmental personnel sufficient to meet the mandate of NEPA and CEQ regulations for a proper interdisciplinary environmental assessment; and (2) the ICC has undertaken a genuine environmental assessment of proper scope over the entire *Fort Wayne Line* rail corridor from Alliance, Ohio to Chicago, Illinois, including segments from Crestline, Ohio to Lima, Ohio to Fort Wayne, Indiana to Gary, Indiana.

 It is undisputed that the ICC has exclusive and plenary authority over rail line abandonments. *Chicago & Northwest Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). Generally, in order to obtain relief from its obligation to provide service on a rail line and permission to physically abandon the property, a rail carrier must apply to the ICC, under 49 U.S.C. § 10903, for a certificate of abandonment (or discontinuance). The ICC must then determine whether "the present and future public convenience and necessity require or permit the abandonment." 49 U.S.C. § 10903(a). In making this determination, the ICC balances the needs of shippers and communities for the line against the burden that the line imposes on the carrier and interstate commerce. *Colorado v. United States*, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878 (1926).

On July 16, 1993, Consolidated Rail Corporation ("Conrail") filed an application with the ICC "to abandon a line of railroad known as the *Fort Wayne Line,* from milepost 363.0 near Warsaw to milepost 424.0 near Valparaiso, a distance of 61 miles in Kosciusko, Marshall, Starke, LaPorte and Porter Counties, Indiana." Two joint protests against the application were filed, one by the Starke County Co-op [7] and The Essex Group, Inc. and the other by Farm Fertilizers, Inc., Crop Fertility Specialist, Inc., United Technologies Automotive, Starke County, City of Plymouth, Town of Bourbon, and Town of Hamlet, Indiana. Additionally, protests were filed by Congressman Steve Buyer and the City of Fort Wayne, Indiana. The issues raised in the protests included projected revenues, normalized maintenance expenses, depreciation, fiber optics revenue, bridge removal costs, community impact, alternative transportation, segmentation, and the environment.

On August 30, 1993, the ICC issued a Decision. This Decision ordered, *inter alia,* an investigation into the proposed abandonment. The Decision also noted that "The Commission's Section of Energy and Environment (SEE) is currently examining the environmental and energy impacts of this proposal and will issue an Environmental Assessment (EA) of the proposed abandonment. This action will not significantly affect either the quality of the human environment or the conservation of energy resources."

Under the schedule established by the ICC's August 30, 1993 Decision, the record will close on October 25, 1993. After the closure of the record and the preparation of

---

7. The Starke County Co-op asserted that Conrail's proposed abandonment was part of a larger, comprehensive plan to abandon the entire *Fort Wayne Line* between Alliance, Ohio, and Chicago, Illinois, via Crestline and Lima, Ohio, and Fort Wayne and Hamlet, Indiana. The Co-op argued that Conrail should not be allowed to segment this portion of the Fort Wayne Line for separate consideration and further charged that the ICC needed to have environmental specialists or scientists on its staff in order to assess the potential environmental impacts of the abandonment adequately. The Co-op requested that Conrail's application be rejected and that all *Fort Wayne Line* abandonment proceedings be stayed pending the additional staffing of the ICC, and the preparation of an Environmental Assessment covering the entire *Fort Wayne Line.* Conrail responded that it had properly delineated the abandonment proposal and that it had complied with the ICC's environmental rules and procedures.

the environmental documentation, the ICC will then vote on the case. Under 49 U.S.C. § 10904(c)(3) [8], the deadline for the issuance of an initial decision on the merits of the abandonment is December 28, 1993. If an administrative appeal of that decision is filed and considered, the deadline for the ICC's final decision or order would be in March of 1994. Upon entry of a final order by the ICC, an allegedly aggrieved party would have the option of filing a petition, within 60 days of the entry of the final order, for judicial review of the order in the proper court of appeals. 28 U.S.C. § 2344 [9].

In support of their motion to dismiss the plaintiffs' complaint, the defendants strongly assert that this court does not have subject matter jurisdiction over this case. The defendants argue that except for very narrow and limited circumstances, the only remedy available to a party allegedly aggrieved by an ICC decision lies in the courts of appeals. Specifically, 28 U.S.C. § 2321(a) provides that:

> Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or part, a rule, regulation, or order of the Interstate Commerce Commission, shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.

Furthermore, the Hobbs Act, 28 U.S.C. § 2342 provides that:

> The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—
>
> \* \* \* \* \* \*
>
> (5) all rules, regulations, or final orders of the Interstate Commerce commission made reviewable by section 2321 of this title. . . .

As the defendants have noted, courts construing the Hobbs Act have uniformly held that, absent a specific statutory exception, the statute provides the exclusive means of judicial review of the orders of the agencies covered. *See, e.g., FCC v. ITT World Communications, Inc.,* 466 U.S. 463, 466, 104 S.Ct. 1936, 1939, 80 L.Ed.2d 480 (1984); *Humko Products v. ICC,* 715 F.2d 360, 362 (7th Cir.1983); *Assure Competitive Transportation, Inc. v. United States,* 629 F.2d 467, 471 (7th Cir.1980). *See also Simmons v. ICC,* 716 F.2d 40, 44 (D.C.Cir.1983).

As stated by the Seventh Circuit Court of Appeals in *Suburban O'Hare Comm'n v. Dole,* 787 F.2d 186, 192 (7th Cir.1986), "the purpose of having agency decisions reviewed by courts of appeals is to avoid duplicative factfinding." The Seventh Circuit further held that "[i]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals we must resolve that ambiguity in favor of review by a court of appeals." *Id. See also Preseault v. ICC,* 853 F.2d 145, 149 (2d Cir.1988), *aff'd,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990); *Bywater Neighborhood Ass'n v. Tricarico,* 879 F.2d 165, 168 (5th Cir.1989).

Additionally, the United States Supreme Court has construed the Hobbs Act as providing unitary review of agency action in the

---

8. 49 U.S.C. § 10904(c)(3) provides that:

 If the Commission decides that an investigation should be undertaken under this section, the investigation must be completed within 135 days, and an initial decision must be rendered within 165 days, after the date the application is filed. Thirty days after such decision, the initial decision shall become the final decision of the Commission unless, during the interim, the Commission decides to hear appeals. If an initial decision is appealed and considered by the Commission, the Commission shall issue a final decision within 255 days after the date of application. Whenever the Commission decides upon investigation that the present or future public convenience and necessity require or permit the abandonment or discontinuance of rail service, it shall, within 15 days of the final decision, issue a certificate which permits the abandonment or discontinuance to occur within 75 days of the date of the final decision.

9. 28 U.S.C. § 2344 provides in relevant part that:

 On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies.

courts of appeals. Specifically, in *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 466–68, 104 S.Ct. 1936, 1939–40, 80 L.Ed.2d 480 (1984), the Supreme Court stated:

> In substance, the complaint filed in the District Court raised the same issues and sought to enforce the same restrictions upon agency conduct as did the petition for rulemaking that was denied by the FCC. See *supra* at [466 U.S. at 465, 104 S.Ct. at] 1938. The appropriate procedure for obtaining judicial review of the agency's disposition of these issues was appeal to the Court of Appeals as provided by statute. (Footnote omitted).

*See also Simmons. v. ICC*, 716 F.2d 40, 44 (D.C.Cir.1983), wherein the Court reviewed the legislative history of the Hobbs Act and determined that Congress intended to produce far-reaching procedural effects in review of ICC orders including the elimination of the three-judge district court and elimination of multiple suits challenging the same Commission order.

■ After considering the plain language of the Hobbs Act along with the relevant case law as·discussed above, it is abundantly clear that the Hobbs Act deprives this court of jurisdiction to enjoin any rule, regulation, or final order of the ICC.

The plaintiffs have apparently conceded that this court does not have jurisdiction under the Hobbs Act. However, plaintiffs point out that they are not seeking review of a final agency action under the Hobbs Act but, rather, they are pursuing an action in the nature of mandamus under 28 U.S.C. § 1361 to compel the ICC to perform duties owed to the plaintiffs. The federal mandamus statute, 28 U.S.C. § 1361 provides:

> The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to. the plaintiff.

The plaintiffs have acknowledged that mandamus jurisdiction may be invoked only when there is: (1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy· available. *Banks v. Secretary of Indiana Family and Social Services Administration*, 997 F.2d 231, 244–45 (7th Cir.1993). Plaintiffs strongly assert that they meet all three requirements for mandamus jurisdiction.

Initially, the plaintiffs contend that they have a clear right to the relief sought in that the ICC has a plainly defined and peremptory duty to employ professional scientists as part of its interdisciplinary environmental staff. Plaintiffs claim that this duty arises from NEPA, as interpreted by the CEQ at 40 C.F.R. 1502.6 and 40 C.F.R. 1507.2(a). Plaintiffs also claim that this duty has been recognized by the courts in *Ashcroft v. Dept. of the Army*, 526 F.Supp. 660 (W.D.Mo.1980), *aff'd*, 672 F.2d 1297 (8th Cir.1982).

NEPA, at 42 U.S.C. § 4332(2)(A), provides that:

> The Congress authorizes and directs that, to the fullest extent possible: (2) all agencies of the Federal Government shall—
>
> (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and decisionmaking which may ·have an impact on man's environment.

Likewise, 40 C.F.R. § 1502.6 provides that:

> Environmental impact statements shall be prepared using an interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

Additionally, 40 C.F.R.· § 1507.2(a) provides that:

> Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to

evaluate what others do for it. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

Plaintiffs also assert that the ICC has a clear duty to conduct "scoping" [10] and that the CEQ clearly requires "scoping" at an early stage. Plaintiffs cite 40 C.F.R. § 1500.5(a), (d); 40 C.F.R. § 1501.2; 40 C.F.R. § 1501.7; and *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), in support of their assertions. 40 C.F.R. § 1500.-5(a), (d) states that:

Agencies shall reduce delay by:

(a) Integrating the NEPA process into early planning (§ 1501.2).

\* \* \* \* \* \*

(d) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.7).

40 C.F.R. § 1501.2 provides in part that:

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts.

40 C.F.R. § 1501.7 provides in part that:

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent

(§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

\* \* \* \* \* \*

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

\* \* \* \* \* \*

(b) As part of the scoping process the lead agency may:

\* \* \* \* \* \*

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

The defendants, however, strongly contend that the plaintiffs do not have a right to challenge either the ICC's staffing or its environmental procedures and, thus, the plaintiffs have failed to state a claim upon which their requested relief (in the nature of a mandamus) may be granted. Specifically, defendants argue that even assuming that a failure by the ICC to staff its environmental unit adequately or to provide for scoping of environmental assessments could have resulted in some injury or harm, the plaintiffs have not alleged that they have suffered or are suffering from an actionable particularized harm or injury in fact. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), wherein the Supreme Court reiterated the standing requirement that the injury alleged must "affect the plaintiff in a personal and individual way."

Defendants also argue that the plaintiffs have failed to show any statutory, regulatory, or constitutional basis for their request for

---

**10.** "Scoping" is defined in the regulations simply as a "process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. Plaintiffs use of the term

"scoping" refers to "the NEPA function by which agency consideration of an action entails off-site effects, related actions, and the avoidance of improper segmentation." Plaintiffs' Brief at 2.

relief. Defendants claim that there is no plainly defined or peremptory requirement in NEPA, the CEQ regulations, or in the ICC's own environmental rules, that the ICC employ professional scientists on its staff.

■ The court agrees with the defendants on both points. First, it is clear to the court that the plaintiffs have not shown the existence of a particularized harm. Plaintiffs have not even alleged that they will suffer a particular injury if the ICC, through failure to employ scientists or to engage in proper scoping, creates an adverse impact on the environment. The plaintiffs have not shown any concern for environmental harm but have only shown concern for their perceived economic harm in the event the *Fort Wayne Line* is abandoned and they have to employ other means of transporting agricultural products, fertilizer, etc. This fear of economic harm, independent of any environmental impact, is not a sufficient basis on which to claim standing to assert a violation of environmental regulations. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)[11]. Further, it is unclear how the plaintiffs' perceived economic injury could be redressed by an order of this court. Even if the ICC were to undertake the steps requested by the plaintiffs, there is no indication that the ICC would not proceed with its abandonment proceedings[12].

■ Additionally, the court agrees with the defendants that the plaintiffs have not shown any plainly defined or peremptory requirement that the ICC employ scientists on its staff. The statutes and regulations cited by the plaintiffs, and set out above, clearly do not place a plainly defined duty on the ICC to employ scientists on its staff. Furthermore, plaintiffs reliance on *Ashcroft v. Dept. of the Army,* 526 F.Supp. 660 (W.D.Mo.1980), *aff'd,* 672 F.2d 1297 (8th Cir. 1982), is misplaced. In *Ashcroft,* the court found that the Army Corps of Engineers had employed a "systematic, interdisciplinary approach" in preparing its environmental impact statement and in making its decision as the Corps had called on experts in various scientific disciplines when it was preparing its statement. 526 F.2d at 676. The Court in *Ashcroft* did not state that NEPA or any regulation promulgated thereunder required the Corps (or any other agency) to employ scientists on its staff. In fact, the *Ashcroft* court did not even discuss the staffing requirements of federal agencies.

■ Likewise, this court finds that the plaintiffs have not shown any plainly defined or peremptory duty on the part of the ICC to perform "scoping analyses" for environmental assessments[13] prepared by the ICC for

**11.** *See Harlem Valley Transportation Ass'n v. Stafford,* 360 F.Supp. 1057, 1065 (D.D.C.1973), wherein the court held that the plaintiffs had standing to contest the ICC's failure to comply with NEPA requirements because they had alleged that, as residents of Harlem Valley, they would be made to suffer from increased noise and air pollution caused by increased truck traffic.

 *See also Lujan v. Defenders of Wildlife,* — U.S. —, — n. 7, 112 S.Ct. 2130, 2142 n. 7, 119 L.Ed.2d 351 (1992), wherein the Supreme Court gave an example of proper standing when asserting "procedural rights":

 [O]ne living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

**12.** In any event, under NEPA, judicial review does not extend to the substantive merits of an

agency's decision. That is, assuming that a federal agency has fully examined the environmental consequences of its proposed action, the courts will not second-guess an agency's eventual decision even if the decision is to proceed with an environmentally unsatisfactory project. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam); *see also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

**13.** An "environmental assessment" is a concise public document that, *inter alia,* briefly provides sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. 40 C.F.R. § 1508.9.

 According to the ICC's Decision of August 30, 1993, the ICC's Section of Energy and Environment (SEE) is presently investigating the environmental impact of the proposed abandonment and will issue an environmental assessment,

all proposed rail abandonment applications. While 40 C.F.R. § 1501.7(b)(3) permits an agency to combine its environmental assessment process with its scoping process, the plaintiffs have not shown that the regulations *require* an agency to perform scoping when it undertakes an environmental assessment. Rather, 40 C.F.R. § 1501.7 clearly indicates that an agency need only perform scoping after it has decided to prepare an environmental impact statement and after it has published a notice of intent in the Federal Register, which notice must "[d]escribe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held." 40 C.F.R. § 1508.22.

Furthermore, plaintiffs' citation to *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), in support of their argument that the ICC is required to conduct scoping at the environmental assessment stage of its abandonment proceedings is unavailing. In *Robertson*, the Supreme Court noted that the Forest Service was required to address the "off-site impacts" of proposed alternatives in its environmental impact statement. *Id.* at 338, 109 S.Ct. at 1840. However, the Supreme Court did not even imply that such a study was required during the environmental assessment stage.

Accordingly, this court finds that the plaintiffs have failed to satisfy the prerequisites for invoking mandamus jurisdiction. The plaintiffs have failed to show that they have a clear right to the relief sought and they have also failed to show a plainly defined and peremptory duty on the part of the defendants to do the acts in question [14]. *Banks,*

*supra,* 997 F.2d at 244–45. Furthermore, the plaintiffs have also completely failed to meet the third prerequisite set forth in *Banks:* a showing that no other adequate remedy is available to them. *Id.*

The defendants have also argued that the plaintiffs' action is not ripe. Defendants point out that the ICC has not issued a final order on Conrail's pending abandonment proposal and, thus, the ICC has not taken any action or rendered a decision that will affect the plaintiffs' substantive rights. As this court has already noted, the ICC has initiated an environmental investigation of Conrail's abandonment proposal. During this investigation, the parties (including the plaintiffs) will have a full and fair opportunity to present their evidence and arguments to the ICC on the environmental and economic issues of the abandonment proposal. The ICC has indicated that after this environmental investigation is complete, it will prepare any necessary environmental documentation and then vote on the abandonment proposal. Upon entry of a final order by the ICC, any party alleging injury by the order may, within 60 days of the entry, file a petition for judicial review in the court of appeals where venue is proper. 28 U.S.C. § 2344.

The defendants contend that, until the agency has issued a reviewable final order, the plaintiffs cannot bring an action as there is no statutory or constitutional provision that allows for judicial review of interlocutory agency orders. Defendants further note that, at this point in the proceedings, the outcome of the environmental investigation and the final ICC vote and order cannot be

---

which will then be released for public review and comment. *See* 49 C.F.R. §§ 1105.6(a), 1105.-10(b).

After considering public comments and the recommendations of its environmental staff, the ICC will determine whether it needs to prepare an environmental impact statement. If such a statement needs to be prepared, the ICC is then expected to undertake the scoping process. *See* 40 C.F.R. 1501.7.

14. The plaintiffs' attempt to establish the existence of a legal duty through the affidavits of their experts is unavailing. Plaintiffs' experts have merely given their opinions as to who they believe should be on the ICC's staff in order to

prepare a proper environmental assessment and when the ICC should begin its scoping process. However, these opinions are not relevant to the issue of whether the ICC is required by NEPA or its implementing regulations to employ scientists on its staff or to conduct scoping at the environmental assessment stage of its proceedings.

Moreover, insofar as these affidavits contain legal conclusions, the affidavits are inadmissible. Consequently, the defendants' motion to strike the affidavits of Robert K. Dawson and Alain L. Kornhauser will be granted on the basis that the affidavits are irrelevant, contain unsubstantiated hearsay, and contain impermissible legal conclusions.

predicted. Thus, the defendants argue that the plaintiffs lawsuit is clearly unripe because it may well develop that the final ICC order will be favorable to the plaintiffs.

The plaintiffs, relying on *Harlem Transportation Ass'n v. Stafford*, 500 F.2d 328, 335 (2d Cir.1974), argue that the issues presented are ripe for review because the issues concern the procedures the ICC utilizes when processing abandonment cases. Specifically, the plaintiffs argue that the ICC, by not employing scientists on its staff or conducting scoping at the environmental assessment stage of the proceedings, is engaged in an ongoing violation of NEPA and its implementing regulations.

In *Harlem Valley, supra*, after noting that the district court had properly determined that it had mandamus jurisdiction as the plaintiffs had shown that the ICC had failed to prepare impact statements, as required by NEPA, the Second Circuit discussed the ripeness doctrine:

> as far as ripeness for review is concerned, the issue here is the legal one of determining whether the ICC has complied with NEPA. The issue concerns all abandonment proceedings. A denial of review now would severely strain the financial resources of environmentalist intervenors, such as plaintiffs here, who would be forced to raise the issue of when the ICC must prepare its draft impact statement in the some 320 abandonment proceedings that were pending nationwide as of January 1974. A delay in review could have serious consequences to the ICC and all interested parties if a court later determined that the procedures the ICC had employed in several hundred proceedings were inadequate under NEPA. We, therefore, conclude that the matters presented here are ripe for judicial review and that we should reach the merits. See generally *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The plaintiffs assert that the reasoning applied in *Harlem Valley* should be applied in the present case because the plaintiffs are seeking to "redress their rights to certain, plainly due, straightforward, threshold procedural requirements, without regard to any specific ICC order." Plaintiffs' Brief at 18.

The defendants, in their reply brief, point out several differences in the *Harlem Valley* case and the present case, not the least of which is the fact that *Harlem Valley* did not involve a challenge to the staffing of the ICC or the ICC's environmental procedures by a plaintiff who failed to demonstrate a right to make such a challenge. Furthermore, defendants claim that the plaintiffs here, unlike the plaintiffs in *Harlem Valley*, cannot claim an injury or harm arising from the ICC's procedures because the ICC is in the process of preparing environmental documentation for the proposed abandonment and this documentation will be completed before the ICC renders its final determination on the abandonment proposal.

Under the circumstances presented in the case at bar, the court finds that the issues presented by the plaintiffs are not ripe for review. The court has previously determined that the plaintiffs have failed to show that the ICC has any duty to perform the acts requested by the plaintiffs. Thus, the plaintiffs' objections to the proposed abandonment will not be ripe for review until the ICC has issued a final, reviewable order.

The defendants have also argued that, in any event, the plaintiffs have failed to state a claim against the CEQ upon which relief can be granted. In light of the fact that this court has determined that it must dismiss plaintiffs' complaint in its entirety for lack of subject matter jurisdiction, lack of standing, and lack of ripeness, the court will not render an opinion on this specific issue.

Next, the court will address the defendants' argument that plaintiffs' motion for leave to file a second amended complaint should be denied because amendment is futile. The plaintiffs have moved pursuant to Fed.R.Civ.Pro. 15 for leave to file a second amended (class action) complaint. Defendants argue that even assuming that the plaintiffs have made the requisite showing for class certification, this case is still not justiciable because it still suffers from lack of subject matter jurisdiction and lack of ripeness.

The law is clear that courts should not grant leave to amend when the proposed amendments would be futile or would serve no purpose. *Foman v. Davis*, 371 U.S. 178,

182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 391–92 (7th Cir.1989); *Glick v. Koenig*, 766 F.2d 265, 268–69 (7th Cir.1985). The plaintiffs have not asserted that their second amended complaint contains facts or allegations which would overcome the jurisdictional defects of their first amended complaint. Consequently, plaintiffs' motion for leave to amend will be denied.

Finally, in light of the fact that the court has determined that the plaintiffs' first amended complaint should be dismissed in its entirety and the plaintiffs' motion for leave to file a second amended complaint should be denied, the court must necessarily deny the City of Fort Wayne's Motion to Intervene or (In the Alternative) Motion to Consolidate.

### Conclusion

For all the foregoing reasons, the defendants' motion to dismiss the plaintiffs' first amended complaint is hereby GRANTED and the defendants' motion to strike affidavits is also hereby GRANTED. Further, the plaintiffs' motion for leave to file a second amended (class action) complaint is hereby DENIED and the City of Fort Wayne's motion to intervene/consolidate is also hereby DENIED.